[No. E002332. Fourth Dist., Div. Two. Dec. 26, 1986.]

PAUL O. JACKSON, Plaintiff and Respondent, v.
BANK OF AMERICA, Defendant and Appellant.

COUNSEL

Hufstedler, Miller, Carlson & Beardsley, Robert S. Thompson, Otto M. Kaus and Peter O. Israel for Defendant and Appellant.

David E. Smith for Plaintiff and Respondent.

OPINION

**McDANIEL, J.**—In an action by Paul O. Jackson (plaintiff) against the Bank of America (the Bank) for rescission, fraud, and negligent misrepresentation, the Bank has appealed from a *default* judgment awarding plaintiff $43,016.64 in compensatory damages and $2.5 million in punitive (exemplary) damages, notwithstanding that the complaint, upon which the "prove-up" of damages was purportedly based, alleged no facts which demonstrated a monetary loss to plaintiff chargeable to any conduct by the Bank. Accordingly, we shall reverse the judgment with directions.

### SYNOPSIS OF THE FACTS

In March 1978, plaintiff loaned Robert R. Rallo (Rallo) five municipal bonds with a combined principal value of $25,000, and Rallo used the bonds as security to obtain a 90-day $23,000 loan from the Palm Desert branch of the Bank.[1] On March 14, 1978, plaintiff signed a security "lent collateral" agreement with the Bank, which recited, among other things, that plaintiff authorized Rallo to use the bonds, without notice to plaintiff, for security for "any present or future indebtedness" of Rallo to the Bank; that the loan of the bonds to Rallo "shall not be construed to make [plaintiff] a guarantor or surety of the indebtedness of [Rallo]," and that *plaintiff waived any right to contend that the loan operated to place him in the role of a guarantor or surety.*

The following month, plaintiff loaned Rallo two additional municipal bonds with a combined principal value of $10,000, and Rallo used the bonds as security to obtain an additional $5,500 loan with the Bank. Plaintiff signed a second security agreement with the Bank as to the additional bonds. The second agreement included exculpatory provisions *identical* to

---

[1]The record reveals that in December 1978, nine months after plaintiff loaned the five bonds to Rallo, plaintiff and his wife owned one hundred municipal bonds with a total principal value of $500,000, and plaintiff and his wife's combined net worth was $1,633,000.

those of the March 14 agreement noted above with reference to plaintiff's nonrole as a guarantor.

About two and one-half months later, the vice-president and manager of the Bank wrote plaintiff that the Bank intended to lend Rallo an additional $4,000; that the new loan required an additional $15,000 in bonds; that plaintiff should authorize the bank to remove three additional $5,000 bonds from plaintiff's file, and that plaintiff should sign a new security agreement with reference to the additional bonds.

Thereafter, plaintiff apparently did authorize the removal of the additional bonds from his file, and did sign the new security agreement. Again, this latest agreement included exculpatory provisions identical to those of the March 14 agreement noted above. The $23,000, $5,500 and $4,000 loans were then combined, and shortly afterwards, Rallo executed a promissory note in favor of the Bank for the total amount of $32,500. The note was due in 90 days (Oct. 10, 1978), and was secured by all 10 municipal bonds referred to above (hereinafter, the bonds).

On January 23, 1979, the Bank renewed Rallo's $32,500 note, with the addition of $800 in accrued interest, making a total amount of $33,300. The new note was due on March 1, 1979, and was secured by the bonds.

On June 1, 1979, the Bank renewed Rallo's $33,300 note with accrued interest of $1,580.09, and an additional loan of $5,103.85, making a total amount of $39,983.94. The new note was due on October 1, 1979, and was secured by the bonds.

Rallo did not pay any part of the $39,983.94 note on October 1, 1979. In order to avoid the Bank's realizing on its collateral by a sale of the bonds, plaintiff on October 10, 1979, replaced Rallo's $39,983.94 note (which was then assigned to plaintiff) with a 90-day note of his (plaintiff's) own for $41,984.52, representing the $39,983.94 due from Rallo, plus $2,000.58 in accrued interest. Also on October 10, 1979, plaintiff executed an "Agreement Regarding Collateral," which recited that plaintiff "intends and agrees" that his own $41,984.52 note would be secured by the bonds as collateral.

Without more, on November 27, 1979, plaintiff filed a "complaint for money due" against Rallo and the Bank![2] In the complaint, notwithstanding his agreement with the Bank in which he had waived any rights to the role

[2]The complaint was filed in Los Angeles County. After the default judgment as to the Bank was entered, plaintiff obtained a change of venue to Riverside County.

of guarantor, plaintiff alleged, among other things, that he was the "personal guarantor" of Rallo's $39,983.94 note, and that the Bank had falsely and fraudulently represented to plaintiff that the principal amount of the note was $23,000, and that Rallo was making the payments under the note. (The complaint made no reference to plaintiff's bonds, nor to any security agreements between plaintiff and the Bank.) Plaintiff sought damages from Rallo and the Bank for $41,984.52 (the amount of plaintiff's October 10, 1979, note *(supra))* in consequential damages, for an unspecified amount of general damages, for $1 million in exemplary damages and for attorney's fees and costs.

On January 10, 1980, the Bank filed a demurrer to the complaint. Shortly afterwards, plaintiff and the Bank stipulated that plaintiff be allowed to amend.

On May 28, 1980, plaintiff, *who had not paid any part of the principal of the 90-day October 10, 1979, note for $41,984.52* (although he had apparently paid $3,129.89 in interest on the note), executed a new 90-day note for the same amount, and a new "Agreement Regarding Collateral" as to the bonds.

On October 3, 1980, after plaintiff had not paid any part of the May 28, 1980, note, the Bank informed plaintiff, in writing, that it would sell the bonds if it did not receive full payment on the note by October 13, 1980. By then plaintiff's first note for $41,984.52 would have been at least nine months delinquent.

On October 6 or 7, 1980, according to the later declaration of the Bank's attorney (Ms. Bloom), an attorney (Mr. Coulombe) in the office of plaintiff's attorney of record (Mr. Hill) telephoned Bloom and told her an amended complaint would be filed, and he, Coulombe, would be seeking a court order "within the next day or so" to attempt to enjoin the Bank from selling the bonds.

On October 8, 1980, Bloom sent a certified letter to Hill, reciting, because the Bank had not been served with any type of court order as to the bonds, that the Bank was prepared to sell them on October 13, 1980, "at the start of business."

On October 13, 1980, or the morning of October 14, 1980, Coulombe left a telephone message at Bloom's office to the effect that he would be in court at 3 p.m. on the afternoon of October 14, 1980, to apply for a temporary restraining order (TRO) prohibiting the Bank from selling the bonds.

On October 14, 1980, plaintiff filed a first amended complaint (the complaint) against the Bank and Rallo and his wife (the Rallos), together with an ex parte request for a TRO and preliminary injunction to restrain the Bank's sale of the bonds. The complaint alleged causes of action against the Bank for: rescission and restitution (of plaintiff's $41,984.52 note) (count 1); TRO and preliminary injunction, *supra,* (count 2); exoneration of surety (count 3); fraud (count 4), and negligent misrepresentation (count 5), and against the Rallos for money due on the assigned $39,983.94 note (count 6) and for indemnification (count 7). Plaintiff later dismissed his claims against the Rallos.

As to the Bank, plaintiff alleged that he had become a "personal guarantor" of Rallo's $23,000 loan on March 14, 1978, by "signing a guarantee and posting ten [bonds] as security for plaintiff's performance of the guarantee";[3] that the Rallos and the Bank had "agreed between themselves . . . without informing plaintiff and without plaintiff's knowledge or consent" to increase the loan from $23,000 to $39,983.94; that the Bank did not act reasonably to protect plaintiff's interest as a guarantor of the $23,000 note, and did not intend to protect such interest; that the Bank had suppressed from plaintiff the fact that the Rallos were a bad credit risk and were not making payments on the note, and that the Bank had fraudulently and negligently induced plaintiff to guarantee Rallo's $23,000 note and to execute his, plaintiff's, $41,984.52 note. Plaintiff sought: (1) to rescind his $41,984.52 note; (2) to prevent the Bank from selling the bonds; (3) to recover general damages of $43,016.64; (4) to recover exemplary damages of $5 million on each of the fraud and negligent misrepresentation causes of action, plus (5) attorney's fees and costs. *It is appropriate to observe here that nowhere in the First Amended Complaint did plaintiff allege that he was out of pocket in any amount.*

At 3 p.m. on October 14, 1980, a hearing was held on plaintiff's request for a TRO. No one appeared on behalf of the Bank. The court granted plaintiff's request, and signed an order restraining the Bank from selling the bonds pending the hearing on plaintiff's request for a preliminary injunction, which was set for October 23, 1980. The order also recited that copies of the complaint and all the documents related to the TRO were to be served on the Bank *that same day,* October 14, 1980.

At about 9:30 the *following* morning (October 15), plaintiff's process server appeared at Bloom's office to serve the foregoing document person-

---

[3]Significantly, plaintiff did not attach to the complaint any copies of the security agreement he had signed with the Bank. Small wonder. They would have directly contradicted the allegation that plaintiff was a personal guarantor of Rallo.

ally on her. He was not able to do so until about 10:30, and apparently the bonds were sold during the one-hour period while he was waiting in the reception area. Thus, the sale of plaintiffs' bonds occurred *after* the latest complaint had been filed. On October 23, 1980, the hearing on the OSC for a preliminary injunction was taken off calendar. The following day, the Bank mailed plaintiff a check for $9,197.20, representing the balance remaining from the sale of the bonds, after the Bank had deducted the principal and interest due on plaintiff's $41,984.52 note.

The Bank did not file an answer to the complaint. In a later declaration, Bloom stated she had not done so because she thought plaintiff's "entire case was mooted by the sale of the bonds." On December 15, 1980, the Bank's default was entered at plaintiff's request, with a declaration that a copy of the request to enter default had been mailed to Bloom on December 11, 1980. Bloom later stated that she had never received notice that plaintiff intended to enter the Bank's default.

*Over six months after* the default had been entered, about June 24, 1981, plaintiff filed and served a request to enter default judgment. On July 1, 1981, the Bank filed its notice of motion for relief from default pursuant to Code of Civil Procedure section 473, on grounds of "mistake and inadvertence." After a hearing, at which plaintiff opposed the motion because it had been made beyond the six-month period required by section 473, and must therefore have been directed to the court's equitable powers, the matter was taken under submission. Thereafter, the motion was granted, without any statement of reasons therefor.

Plaintiff appealed from the order granting the Bank relief from default. In *Jackson* v. *Bank of America* (1983) 141 Cal.App.3d 55 [190 Cal.Rptr. 78], Division Four of the Second District Court of Appeal held that the trial court had abused its discretion in granting relief under section 473, in that: (1) the Bank's neglect in failing to file an answer because it considered the case moot was "not of the excusable variety" (*id.,* at p. 58), and (2) the Bank's motion for relief had been filed more than six months after the entry of default, and "the trial court was not asked to grant relief on the basis of extrinsic *fraud." (Id.,* at p. 59, italics added.) Thereupon, the order granting the Bank relief from default was reversed without directions.

Two months after the remittitur was received, the Bank obtained new counsel and filed a motion for equitable relief from default, on grounds of extrinsic *mistake* or *accident.* The moving papers did not refer to fraud. In a declaration in support of the motion, Bloom reiterated that she had not filed an answer because she had thought the case was moot, and offered the additional excuse that she had relied on plaintiff's attorneys, as reputable

members of the State Bar with whom she had a "reasonable working relationship," to abide by the general rule that an attorney should not take advantage of opposing counsel by causing a default to be entered without first inquiring about the opposition's intentions or giving notice to the opposing counsel.

At the hearing on the Bank's motion for equitable relief, the Bank argued that the *Jackson* court's language as to the Bank's inexcusable negligence, *supra,* was dicta, and, in any event, did not apply to the Bank's new argument as to Bloom's reliance on the conduct between professionals regarding notification. The trial court (Judge Younger) disagreed, stating that it would prefer to rule in favor of the Bank on the "continuous-course-of-conduct-and-communication-between-counsel issue," that the previous trial judge had "obviously" done so on that basis, but that his, Judge Younger's, hands were "tied" by the appellate court, which had ruled against the Bank "on *all* theories" (italics added) advanced for setting aside the default. The motion for equitable relief was accordingly denied. However, the resulting minute order recites no reasons for the denial.

*About nine months later,* plaintiff obtained a change of venue to the eastern district (Indio) of Riverside County. *Yet another year later,* plaintiff arranged for a "prove-up" hearing *on shortened time* before a court commissioner sitting as a judge pro tempore. The evidence at the hearing consisted of plaintiff's testimony, and the entire contents of a 264-page "Bench Book."[4]

At that hearing, plaintiff's attorney began by calling the court's attention to the first document in the bench book, which was the appellate court opinion in *Jackson* v. *Bank of America, supra,* 141 Cal.App.3d 55. Although *Jackson* had been issued in March 1983, over *two years after* plaintiff's first amended complaint had been filed, although the factual recitation in *Jackson* was concerned almost entirely with events which had occurred *after the complaint had been filed,* such as the circumstances surrounding the Bank's sale of plaintiff's bonds and the Bank's failure to answer the complaint, and although the legal issue in *Jackson* was limited to whether the Bank's default should have been set aside, plaintiff's attorney told the court that the opinion "deals with the underlying issues of this case." The court responded that it would take judicial notice of the opinion.

---

[4]The bench book has been included in the record as a supplemental clerk's transcript. No other witnesses appeared at the hearing despite the fact that the stated ground for seeking a change of venue was that three material witnesses necessary to prove plaintiff's case lived in Coachella Valley. At oral argument of the appeal counsel for the Bank aptly characterized this palpably contrived and protracted scenario as "Fabian."

Plaintiff's attorney then said, by way of opening argument: "If I may outline the basics of this case. *The action stems from the fact that the Bank of America sold some bonds of [plaintiff] without his authority and against his wishes and the action is for the recovery of the value of those bonds,* plus punitive damages as set forth in the complaint." (Italics added.) The attorney then called the court's attention to the second and third documents in the bench book, which were, respectively, the declarations of plaintiff's previous attorney and of plaintiff's process server, as to the events surrounding the Bank's sale of the bonds, *events which had all occurred after the complaint had been filed.* Plaintiff's current attorney then briefly summarized the foregoing declarations, and concluded his argument as follows: "I believe that is only a part of the background that shows the attitude of the Bank of America in this case. They refused at every stage to acknowledge the restraining order of the Court, they avoided service and once the bonds had been sold they said, well, we are sorry." The attorney then introduced a copy of the first amended complaint, which was included in the bench book about 10 pages *after* the foregoing declarations. The court admitted the entire bench book into evidence (although no reference had been made at that point to over four-fifths of its contents).

Thereupon plaintiff testified, as follows: he had "guaranteed" a $23,000 loan for Rallo; he had never agreed to guarantee a loan of more than $23,000; he had never been told that the Bank intended to increase the amount of the loan; the Bank manager told him that the loan was "guarantee[d]" by the Bank's first mortgage on Rallo's house; the Bank manager told him, plaintiff, if he did not sign a note for $41,984.52, that his bonds would be sold; he, plaintiff, contacted an attorney and asked him to stop the sale, and "after" the bonds were sold, he "proceed[ed]" with this action."

Plaintiff's attorney then drew the court's attention to over 35 items in the bench book, all allegedly related to the Bank's conduct in regard to the Rallo loans in question. At least three of the thirty-five items were related to the Bank's sale of the bonds, an event which had taken place after the complaint had been filed. No reference was made, during the attorney's lengthy exposition of the items in the bench book (seven and a half pages in the reporter's transcript) to any of the security agreements signed by plaintiff, *supra.* Nor have we found copies of any such agreements in the bench book. As earlier noted, these agreements specifically provided that plaintiff had waived the role of a guarantor as to Rallo.

The attorney then said that he had "computed the damages *based on the allegations of the complaint and you start off with the sale of the bonds.*" (Italics added.) Despite the fact that the complaint contained no allegations as to the *sale* of the bonds, because the bonds were sold after the complaint

was filed, and despite the fact that the prayer of the complaint had requested general damages of only $43,016.64 (based on plaintiff's $41,984.52 note which was paid after the complaint was filed), plaintiff's attorney computed plaintiff's general damages as *$95,103.50,* based principally on the *post-complaint* payment of the $41,984.52, plus the *post-complaint* interest plaintiff lost from the sale of the bonds. (The $95,103.50 apparently included $6,206.25 in pre-complaint interest payments on the $41,984.52 note.) As to exemplary damages, plaintiff's attorney argued that they should be "extremely high," "in excess of two million dollars," because the Bank had, among other things, "st[olen]" the bonds from plaintiff. The attorney argued that the exemplary damage award should be two and one-half million dollars, which would be one-half of that asked for in the complaint. Without further discussion as to the foregoing figures, the court awarded $95,103.50 in general damages and $2.5 million in exemplary damages. The court asked plaintiff's attorney if attorney's fees were indicated. The attorney said they were, but he did not want to pursue the issue, *because then he would have to amend the complaint and serve the Bank.*[5]

The minute order entered following the default hearing recited that the court "grants judgment in the sum of *$95,103.50,* punitive damages in the sum of $2,500,000.00 . . . Counsel for Plaintiff to prepare formal judgment." (Italics added.) The formal judgment, which was filed a week later, awarded plaintiff general damages of *$43,016.64,* "as alleged in the FIRST AMENDED COMPLAINT," and exemplary damages of $2.5 million. There is no indication in the record as to why the $95,103.50 was changed to $43,016.64. This appeal followed.

DISCUSSION

The Bank contends: (1) its latter motion for relief from default based on equitable grounds should have been granted; (2) plaintiff's argument and proof at the default hearing constituted a de facto amendment of his complaint, which "opened" the Bank's default and entitled it to be served and to answer; (3) the damages are against the law.

I

THE BANK'S MOTION FOR RELIEF FROM DEFAULT ON EQUITABLE GROUNDS

■ The Bank contends, as it did in the trial court, that its default should have been set aside on equitable grounds, and, because the appellate

[5]The complaint alleged that plaintiff was entitled to attorney fees, and that plaintiff would ask leave to amend to establish the reasonable amount thereof.

court never reached that issue, that the trial court (Judge Younger) was free to address it. However, the Bank's motion for equitable relief was based on *extrinsic mistake.* ■■ ■ Extrinsic mistake involves " 'the *excusable* neglect. . . to appear and present [a] claim or defense' " (*Kulchar* v. *Kulchar* (1969) 1 Cal.3d 467, 471 [82 Cal.Rptr. 489, 462 P.2d 17, 39 A.L.R.3d 1368]; italics added), and, as noted, *Jackson* held that the Bank's "neglect" in failing to. file an answer because it assumed the case was moot "was not of the excusable variety." (*Jackson* v. *Bank of America, supra,* 141 Cal.App.3d 55, 58.)

On appeal, the Bank has not squarely addressed the foregoing holding, and argues, because *Jackson's* decision that relief should not have been granted was based on section 473, that the court did not purport to decide "any" issue with respect to extrinsic *fraud* or mistake.[6] However, as noted, one of the grounds of *Jackson's* decision on the section 473 issue was that the Bank's negligence had been *inexcusable,* and as also noted, inexcusable negligence precludes equitable relief *on the grounds of extrinsic fraud or mistake.* Moreover, a court' s equitable power is *narrower* than its power under section 473 ( *Weitz* v. *Yankosky* (1966) 63 Cal.2d 849, 857 [48 Cal.Rptr. 620, 409 P.2d 700]). Accordingly, the *Jackson* holding that the Bank was inexcusably negligent under a section 473 standard would, a·fortiori, decide the negligence issue with respect to extrinsic fraud or mistake, and thus preclude a later decision that the Bank was entitled to equitable relief.

In the trial court, the Bank argued that the *Jackson* holding as to the Bank's negligence applied only to its counsel's alleged failure to file an answer because she thought the complaint was moot, and not to her later excuse that she had relied on opposing counsel not to enter the default without informing her. However, it would seem that inexcusable negligence would not be transformed into excusable negligence, under a stricter standard, by a reliance on *opposing* counsel, particularly where, as here, the "reasonable working relationship" Bloom claimed to have had with plaintiff's attorney was undoubtedly strained by the circumstances surrounding the Bank's sale of plaintiff's bonds.

In light of all the above, it is our view that the trial court in Los Angeles correctly decided that it was precluded by *Jackson* from granting the Bank's latter motion for relief from default on equitable grounds.

---

[6]At oral argument counsel for the Bank suggested that plaintiff had failed to mail the Bank a copy of his request to enter the Bank's default, and that such a failure would constitute extrinsic fraud. However, although the Bank referred to extrinsic fraud in its argument at the hearing of its motion for equitable relief, the motion was based on extrinsic mistake only, and did not refer to fraud. Moreover, the Bank's inexcusable negligence (*Jackson, supra,* 141 Cal.App.3d 55) would also preclude equitable relief on grounds of extrinsic fraud (*Kulchar* v. *Kulchar, supra,* 1 Cal.3d 467, 473).

## II

### THE DEFAULT HEARING

The Bank contends that plaintiff's argument and proof at the default hearing constituted a de facto[7] amendment of his complaint which relieved the Bank of its default and entitled it to be served anew and then to answer. We agree. Plaintiff does not argue with the proposition that the Bank would be entitled to be served and to answer an amended complaint, but contends: (1) no such amendment took place because the judgment after the default hearing did not go beyond the *amount* of damages alleged in the complaint, and (2) our scope of review is limited to whether the damages awarded at the default hearing were supported by the *evidence*. Amazing!

The answer to these deceptive contentions is: (1) the amendment here was not as to the *amount* of damages, but as to *the facts* alleging plaintiff's *entitlement* thereto, and (2) "unless the *facts* essential to the support of the case be *alleged* upon the record, *evidence* upon such omitted facts cannot be heard or considered." *Hicks* v. *Murray* (1872) 43 Cal. 515, 522, italics added.) "To hold otherwise would mean that this court sanctions a procedure under which a defendant may be *trapped* by a default judgment." (*Burtnett* v. *King* (1949) 33 Cal.2d 805, 811 [205 P.2d 657, 12 A.L.R.2d 333], italics in original.)

"The statutes are very specific in their requirements for a judgment following a default. 'The relief granted to the plaintiff, if there be no answer, *cannot exceed,* that which he shall have *demanded* in his complaint . . . (Code Civ. Proc., § 580). In cases where no answer has been filed and a default has been entered, but the clerk may not enter a default judgment, the plaintiff may apply to the court 'for the relief *demanded* in the complaint'. . . (Code Civ. Proc., § 585(2) [now § 582,. subd. (b)].) Manifestly 'demanded' means *claimed, asserted a right to or* prayed for." (*Burtnett* v. *King, supra,* 33 Cal.2d 805, 806-807, statutory emphasis in *Burtnett,* other italics added.) "As against a defaulting or disclaiming defendant, the relief must be consistent with *the case made upon the complaint and* embraced within *the issues.* (Code Civ. Proc., sec. 580.)" (*Balfour-Guthrie Inv. Co.* v. *Sawday* (1901) 133 Cal. 228, 230 [65 P. 400], italics added.) "A default admits *the material allegations of the complaint,* and no more. . . . the relief given to the plaintiff cannot exceed that which the law awards as *the legal conclusion from the facts alleged*

---

[7]Black's Law Dictionary (5th ed. 1979) defines *de facto* as: "[i]n fact, in deed, actually . . . the contrary of *de jure,* which means rightful, legitimate, just or constitutional."

[citing section 580]." (*Ellis* v. *Rademacher* (1899) 125 Cal. 556, 557 [58 P. 178], italics added.)

■ In the case here, although plaintiff alleged, in conclusory terms, that he *had* been damaged in the sum of at least $43,016.64 *because* he had guaranteed Rallo's $23,000 note (which in reality was false) and had executed his own $41,984.52 note, these facts alone would not entitle him to any damages, without additional allegations as to a *causal connection* between the foregoing events and the monetary loss. In other words, plaintiff did not allege that the Bank had enforced the guarantee or collected on the $41,984.52 note, or that plaintiff had paid any money to the Bank because of the guarantee or the $41,984.52 note. (Although plaintiff had apparently paid $6,206.25 in interest on the note before the complaint was filed [see *ante*], there were no allegations in the complaint as to that payment.)[8]

Accordingly, on the basis of the foregoing authorities, plaintiff's failure to amend the complaint before the default hearing to allege *any* conduct of the Bank which had caused him to lose the alleged $43,916.64 precluded him from proving at the hearing that the Bank's conduct in collecting interest on the $41,984.52 note before and after the complaint had been filed, and in selling the bonds after the complaint had been filed, had caused him to lose the $43,016.64 (much less $95,103.50). Nor was the erroneous admission of such evidence at the default hearing cured by reducing the $95,103.50 in compensatory damages which had been awarded at the hearing to the $43,016.64 award in the judgment following the hearing, and by reciting in the judgment that the foregoing damages had been incurred "as a result of" plaintiff's executing the $41,984.52 note.

■ Plaintiff's contention as to our standard of review is based on *Uva* v. *Evans* (1978) 83 Cal.App.3d 356 [147 Cal.Rptr. 795], a dog-bite case, where the defaulting defendant contended on appeal that the $30,000 damage award was "grossly disproportionate to the injury *suffered." (Id.,* at p. 362, italics added.) (There was no contention that the injury had not been alleged.) The reviewing court agreed with the defendant, and, in an opinion written by Justice Kaus, overturned the $30,000 award on the grounds that the evidence at the default hearing had showed actual and estimated expenses of less than $3,000, and that an appellate court could review a default award in a case where it was "totally unconscionable and without evidentiary justification." (*Id.,* at p. 364.)

---

[8] In his rescission count, plaintiff offered to return Rallo's note to the Bank, on condition that the Bank *return plaintiff's* bonds and "all funds paid by plaintiff to [the] Bank to date." However, plaintiff did not allege what, if any, funds *had* been paid to the Bank, or, if funds had been paid, *why* they had been paid. Moreover, no allegation as to any "funds paid by plaintiff" was included in any of the other counts.

In *Uva,* however, it was undisputed that the injury had been suffered *before* the complaint had been filed; that the complaint had alleged the injury and requested $30,000 in damages, and that "section 580 was fully complied with." (*Uva* v. *Evans, supra,* 83 Cal.App.3d 356, 360-361.) Clearly, such was not the case here. ■ We do not contest the proposition, in a case involving a default judgment where section 580 has been fully complied with, that review on appeal is limited to whether the damages awarded are unconscionable and without evidentiary support. ■ Here however, because section 580 was not fully complied with, our review is not thusly limited.

■ A defendant in a default action " 'ha[s] the right to assume that the judgment which would follow a default on her part would embrace only the issues presented by the complaint *and* the relief therein prayed.' " (*Burtnett* v. *King, supra,* 33 Cal.2d 805, 808, original italics.) ■ Here, the Bank's attorney, Bloom, assumed that plaintiff's complaint was "moot," because the *only* relief plaintiff would have been entitled to on the basis of the allegations of the complaint would have been the prevention of the sale of the bonds, and, in order to obtain any *additional* relief, such as monetary damages, plaintiff would have had to amend his complaint to include allegations as to his payment of interest on the $41,984.52 note or as to the sale of the bonds. In this sense, Bloom's failure to file an answer was theoretically understandable, although, in view of what transpired, strategically ill-advised. It was theoretically understandable because there was no way plaintiff could prove his damages without amending his complaint, and Bloom undoubtedly assumed that plaintiff was aware of such predicament, and that he would amend the complaint *without any further action on the part of the Bank.*[9]

Plaintiff also argues that there was no de facto amendment of his complaint because the record is devoid of any *statutory* request therefor, or any *court authorization* thereof. However, it is precisely the absence of such a formal procedure which renders the variance between plaintiff's pleading and proof a de facto rather than a de jure amendment (see fn. 7, *ante).* Moreover, if we were to accept plaintiff's argument, then *any* new evidence, based on *any* theory, could be introduced at a default hearing, as long as no formal amendment were requested, and the default judgment as to compensatory *and exemplary* damages were limited to the amount prayed for in the complaint. Under such a scenario, a plaintiff in a default proceeding would not be concerned with limiting his proof to his pleadings, but rather with

---

[9]Of course our foregoing discussion as to plaintiff's compensatory damages applies equally to his exemplary damages, in that the argument and evidence at the default hearing as to those damages were based principally on the circumstances surrounding the Bank's sale of the bonds.

concealing any variance between the two from the court and the record. In the case here, for example, the default hearing was obtained on shortened time; the commissioner who presided at the hearing apparently was unfamiliar with the case and did not read the complaint before he made his rulings, and, obviously was unaware that such rulings were based on evidence of events *which had occurred after the complaint had been filed.* Furthermore, any variance between the pleading and the proof at the default hearing was not apparent from the default judgment, which referred repeatedly and exclusively to "the allegations of . . . THE FIRST AMENDED COMPLAINT."

"It is well established law that where, after the default of a defendant has been entered, the complaint is amended in matters of substance as distinguished from mere matters of form, the amendment opens the default and unless the amended pleading be served on the defaulting defendant, no judgment can be entered on the default." (*Gerardo* v. *Gerardo* (1952) 114 Cal.App.2d 371, 374 [250 P.2d 276]. In *Gerardo,* a divorce case, the defendant wife did not answer the husband's complaint, in apparent reliance on its allegations that custody of the parties' child would be awarded to her. After the husband testified at the default hearing, *the court* amended the allegations and prayer of the complaint to grant custody of the child to the husband. The wife appealed, and the reviewing court held that the wife should have been served with the amended complaint and afforded an opportunity to be heard, because the amendments were matters of substance, and the wife was apparently relying on the allegations of the complaint as originally served.

In the case here, because the de facto amendments regarding plaintiff's interest payments on the $41,984.52 note and the sale of the bonds were matters of substance, and the Bank was apparently relying on the allegations of the complaint, where no conduct on the Bank's part causing any actual loss of plaintiff had been alleged, the de facto amendments should have been formalized and served on the Bank, and the Bank should have been given an opportunity to be heard. We see no distinction between the formal or de jure amendments in *Gerardo* and the informal or de facto amendments here, particularly because the lack of any formal amendment on the court's part here was chargeable to plaintiff's highly questionable orchestration of this default hearing, where, unlike the hearing in *Gerardo,* the commissioner was palpably misled concerning the variance between the pleadings and the proof.

An additional reason for our decision that the Bank's default should be vacated is that the admission of evidence at the default hearing as to the sale of the bonds was clearly prejudicial error, and would require a new

hearing.[10] However, a new hearing on the allegations of the complaint would be futile, because, as noted repeatedly, there are no allegations therein charging any conduct of the Bank which caused any actual monetary loss to plaintiff. Accordingly, before plaintiff can properly prove his damages at a new default hearing, it will be necessary for him to amend his complaint and to serve the Bank. As a consequence, the Bank's default must be vacated before the matter can proceed.

## DISPOSITION

The judgment is reversed, and the trial court is directed to enter its order setting aside the Bank's default and to provide that the case shall not proceed unless and until plaintiff files a pleading which alleges the events it attempted to prove at the May 17, 1985, hearing.

Campbell, P. J., and Kaufman, J., concurred.

Respondent's petition for review by the Supreme Court was denied March 26, 1987. Lucas, C. J., Panelli, J., and Kaufman, J., did not participate therein.

---

[10]The Bank's third contention, *ante,* that the damages were illegal, is based principally on the erroneous assumption of the evidence, as to the sale of the bonds. Our discussion of the default hearing makes it unnecessary to address the Bank's contention as to damages.