[No. G031778. Fourth Dist., Div. Three. Dec. 14, 2005.]

ELECTRONIC FUNDS SOLUTIONS, LLC et al., Plaintiffs and Respondents, v.
MICHAEL MURPHY et al., Defendants and Appellants

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II.B and II.E.

COUNSEL

Akin Gump Strauss Hauer & Feld, William A. Norris, Edward P. Lazarus, L. Rachel Helyar; Bennett & Fairshter, Joel R. Bennett and Matthew J. Fairshter for Defendants and Appellants.

Johnson and Associates and Einar Wm. Johnson for Plaintiffs and Respondents.

OPINION

**ARONSON, J.**—Defendants Electronic Payments Technologies, LLC (EPT), Michael Murphy and Ty Bishop appeal a default judgment of $24,040,272 entered in favor of plaintiffs Electronic Funds Solutions, LLC (EFS) and Michael Barry following the trial court's order striking defendants' answer as

a discovery sanction. Defendants contend (1) the court should have limited compensatory damages to $50,000, the amount requested in plaintiffs' complaint; (2) the complaint failed to state causes of action supporting the damages awarded; (3) no substantial evidence supported the damages awarded; (4) plaintiffs were not entitled to either treble or punitive damages; (5) the legal theories and facts asserted in the default prove-up materially differed from those alleged in the complaint and therefore opened the default; and (6) the sanction striking defendants' answer violated their due process rights.

We conclude the trial court did not err by issuing a terminating sanction, but we reverse the judgment because the trial court awarded damages based on EPT's value, instead of EFS's lost profits. We also conclude that plaintiffs' complaint for damages "in an amount in excess of $50,000," failed to provide defendants notice of their maximum potential liability. Consequently, on remand the compensatory damages award may not exceed $50,000. Alternatively, plaintiffs may elect to amend their complaint to specify greater compensatory damages, which will open defendants' default. Because we vacate the compensatory damage award, we must also vacate the punitive damage award.

I

FACTUAL AND PROCEDURAL BACKGROUND

A. *The Complaint*

According to plaintiffs' complaint, around March 2000, Barry, Murphy, and Bishop orally agreed to form EFS, a company designed to assist merchants in electronically recovering funds from customers' bank accounts when their checks are dishonored. The parties agreed Barry would be the company's chief executive officer and president. Murphy and Bishop were named vice-presidents with responsibility for running EFS's Orange County office and maintaining the company's books and records. Although EFS officers, Murphy and Bishop had no management authority and could not make substantive decisions on behalf of EFS without Barry's knowledge and approval.

The business had no ready clients at its inception, but the marketing efforts of all three principals soon attracted numerous clients. EFS also entered into licensing agreements with suppliers who provided processing services necessary to operate the business. By December 15, 2000, EFS had contracts with at least 51 merchant customers.

In December 2000, Murphy and Bishop refused to sign a written operating agreement for EFS, declared they no longer wished to do business with Barry, and announced their withdrawal from the company. Instead of leaving EFS's Orange County office, however, Murphy and Bishop changed the locks and converted company assets, such as computers and software, to their use. They removed Barry's password access to EFS's website, appropriated EFS's incoming mail, and stopped forwarding EFS's telephone calls to Barry. Though they claimed to have left the company, Murphy and Bishop converted monies held for, and owed to, EFS and entered into contracts in EFS's name without Barry's knowledge or consent. Murphy and Bishop adopted a new company name, EPT, but misled EFS's customers into believing EPT was merely a new name for EFS.

Plaintiffs' February 2001 complaint alleged the following: (1) breach of fiduciary duty; (2) conversion; (3) intentional interference with economic relations; (4) intentional interference with prospective economic relations; (5) negligent interference with economic relations; (6) negligent interference with prospective economic relations; (7) misappropriation of trade secrets; (8) unfair competition and untrue and misleading advertising; (9) trespass as to real and personal property; (10) accounting; (11) declaratory relief; and (12) money had and received. The complaint sought injunctive and declaratory relief, along with damages "in an amount in excess of $50,000 and according to proof." In response to defendants' subsequent demand for a bill of particulars, plaintiffs provided damage calculations in excess of $1,840,000.

## B. *First Inspection Demand*

Plaintiffs propounded several discovery requests, including specially prepared interrogatories and document inspection demands. The first set of inspection demands sought to examine the business records of EFS and EPT. After defendants objected, the parties settled the discovery dispute when defendants stipulated to produce all responsive documents not covered by the attorney-client and work product privileges. Defendants also agreed to "liberally" construe the document request, "resolving any alleged doubts in favor of production." The defendants agreed to affirm in a supplemental statement they had not withheld any documents except those protected by the attorney-client and work product privileges. The stipulation expressly required the production of all electronic data, including e-mail messages. The trial court entered the stipulation as a court order.

Defendants served the supplemental statement affirming they had produced all documents in their possession responsive to the first set of requests, with the exception of attorney-client/work product documents created while defending the litigation. The statement asserted, however, a computer virus

destroyed responsive e-mails on Murphy's computer several months after plaintiffs served the document demand.

Concluding the supplemental statement did not comply with the stipulated order, and that defendants continued to withhold responsive documents, plaintiffs sought terminating sanctions in a contempt proceeding. At the hearing, the court ordered defendants to serve within seven days a revised supplemental statement and to produce all responsive documents per the stipulated order. The court also imposed $1,000 in sanctions against each defendant.

Defendants provided a revised supplemental statement and additional documents at Murphy's first deposition session, and produced more documents at the second session of Murphy's deposition, which occurred after the court's seven-day deadline for compliance. Defendants failed to produce any electronic data. During Murphy's deposition, plaintiffs discovered that documents requested in the first document demand had not been produced. Defendants later turned over more documents responsive to the first demand, but plaintiffs claimed defendants violated the stipulated order because other responsive documents had not been produced.

## C. Second Inspection Demand

On April 10, plaintiffs moved for sanctions and to compel production on their second set of document inspection demands. These demands essentially sought to inspect EPT's computers, including the one that stored the e-mails destroyed by the computer virus. Although defendants lodged several objections to the demands, they failed to raise any objections in their opposition to plaintiffs' motion. Indeed, despite filing an "opposition," defendants represented they were not opposing the motion to compel, and agreed to turn over one computer they believed belonged to EFS (EFS Computer), and permit plaintiffs to copy the hard drives of EPT's four other computers (EPT Computers).

The trial court granted plaintiffs' motion without qualification, ordered defendants to produce the items within 15 days, and imposed sanctions. The court's order included the following warning: "DEFENDANTS ARE ALSO PUT ON NOTICE THAT FAILURE TO TIMELY COMPLY WITH SAID DISCOVERY ORDERS COULD RESULT IN THE ISSUANCE OF AN ORDER TO SHOW CAUSE RE CONTEMPT AND/OR THE IMPOSITION OF SANCTIONS, INCLUDING MORE SEVERE SANCTIONS, INCLUDING BUT NOT LIMITED TO THE STRIKING OF ANY DEFENDANT'S

ANSWER OR CROSS-COMPLAINT, OR THE STRIKING OF DEFEND-
ANTS' ANSWERS AND ENTRY OF DEFAULT JUDGMENT AGAINST
THEM."

Defendants gave the EFS Computer to plaintiffs in the courthouse parking
lot immediately after the hearing, and produced the four EPT Computers at
EPT's offices for hard drive imaging. Plaintiffs' computer forensic consultant,
George Hiscox, examined the computers' hard drives to determine if any data
had been removed or destroyed. In his report, Hiscox concluded the four EPT
Computers had their hard drives "wiped" by "Data Eraser" software between
the time the court ordered their production and Hiscox's inspection. The
wiping program writes over each hard drive sector to ensure all traces of data
formerly stored on the machine cannot be retrieved. Hiscox surmised that
data had been copied from the hard drives, the drives wiped, and selected
data reinstalled. One EPT Computer, however, had extractable data due to
incorrect use of the wiping program. Using forensic techniques, Hiscox
recovered an Outlook calendar, contacts, e-mail, and attachments.

The EFS Computer's hard drive had also been wiped by the Data Eraser
software, but the program had been aborted before completion. The Data
Eraser program was run on April 10, 2002, at approximately 2:35 p.m. Given
the hearing on the motion to compel on April 10 began at 3:00 p.m., and
defendants had promised to hand the computer over at the hearing, it appears
the defendants aborted the Data Eraser program because defendants ran out of
time to complete the wiping process. Although interrupted before it could
complete its work, the Data Eraser program did destroy the hard drive's
master boot record, partition table, file allocation table, and a number of other
sectors. The destruction of these portions of the hard drive made the
computer impossible to start up, and prevented the hard drive from being read
even as a secondary drive to a running computer. The data recovered from
this computer was obtained through forensic techniques.

Despite the intentional destruction of data on the hard drives, defendants
served supplemental responses asserting under oath they had fully complied
with the demands, making no mention of any data removed from the
computers.

D. *Other Discovery Matters*

In addition to the second inspection demands, the April 10 motions to
compel included plaintiffs' third inspection demand, and first and second set

of specially prepared interrogatories. Except as to plaintiffs' first set of specially prepared interrogatories to EPT,[1] the trial court granted all of the motions to compel, with monetary sanctions imposed against defendants for each. The court also stayed further discovery until plaintiffs informed the court that defendants had fully complied with the outstanding discovery orders. Despite the court's order staying discovery, defendants served a subpoena on Hiscox.

Plaintiffs also propounded a supplemental inspection demand, seeking any newly acquired documents responsive to the first document inspection demand. Defendants never responded to this request, despite their attorney's agreement to do so.

Plaintiffs also served a subpoena upon EFT Network, one of EPT's service providers. EFT Network had agreed to comply with the subpoena, but defendants' attorney, without seeking to quash the subpoena or request a protective order, contacted EFT Network and threatened to terminate all business with the company if it complied with the subpoena.

E. *Motion for Terminating Sanctions*

Based on defendants' alleged destruction of evidence, continued failure to comply with the court's discovery orders and other discovery abuses, plaintiffs filed an ex parte application to clarify the trial court's discovery stay order and to delay the trial 30 days. Plaintiffs explained they needed the additional time to complete their review of defendants' discovery responses and to file a motion for terminating sanctions. The trial court appointed a discovery referee and ordered the parties to submit all further discovery matters to him.

The referee denied plaintiffs' ex parte application, in part because of plaintiffs' purported failure to file a supporting declaration. Although plaintiffs did not request permission to file a motion for terminating sanctions, the referee interpreted the ex parte application as doing so. Accordingly, the referee's recommendation included the following: "[T]he request for leave to file a motion for terminating sanctions is rendered moot by the introduction of defendant FEDCHEX into this action, and the resulting continuance of trial and relevant critical dates." The trial court adopted the referee's recommendations.

---

[1] Plaintiffs' motions to compel responses to their first set of specially prepared interrogatories against EPT centered on allegations made in EPT's cross-complaint. The trial court denied the motions to compel responses to these interrogatories because EPT dismissed its cross-complaint before the hearing.

Plaintiffs later filed a motion for terminating sanctions before the referee. Around this time, plaintiffs also served upon defendants documents entitled "Plaintiffs' Statement of Damages and Plaintiffs' Notice of Amount of Punitive Damages Sought." In the statement of damages, plaintiffs claimed losses, excluding interest, of $8,040,272.19. In the notice of punitive damages, plaintiffs sought exemplary damages of $16 million.

The referee recommended the trial court strike the motion as inconsistent with the court's previous order. But the trial court sustained plaintiffs' objection to the recommendation and set a hearing on whether to impose terminating sanctions. Plaintiffs argued at the hearing that defendants had not complied with any of the court's discovery orders regarding plaintiffs' inspection demands, and first and second sets of specially prepared interrogatories. Plaintiffs emphasized evidence that defendants tampered with the hard drives of the EPT and EFS Computers. In addition, plaintiffs relied on defendants' violation of the discovery stay, interference with the subpoena served on EFT Network, and failure to respond to the supplemental inspection demand.

The trial court granted the motion, and struck the cross-complaints of Murphy and Bishop, struck defendants' answer to the complaint, and ordered defendants' default entered. The court later denied defendants' motion under Code of Civil Procedure section 473 to overturn the order, claiming their attorneys were responsible for the discovery abuses. Plaintiffs then filed an application for a default judgment, with supporting evidence.[2]

Before the court could rule on the request for default judgment, Bishop filed for bankruptcy. Granting plaintiffs' motion to sever, the trial court entered judgment against Murphy and EPT. The trial court later entered judgment against Bishop when the bankruptcy court lifted the stay. The judgments assessed against defendants compensatory damages of $8,040,272.19, and punitive damages of $16 million, the amounts reflected in the statement of damages and notice of punitive damages, and provided plaintiffs with prejudgment interest and attorney fees. Defendants filed timely notices of appeal,[3] and a motion to augment the record.[4]

---

[2] All statutory references are to the Code of Civil Procedure unless otherwise indicated.

[3] Defendants associated the law firm of Akin Gump Strauss Hauer & Feld LLP as cocounsel on the appeal.

[4] Defendants' motion to augment seeks to include in the record the notice of appeal filed by Murphy and EPT, and defendants' supplemental responses to EFS's second set of specially prepared interrogatories. We grant the motion to augment as to the notice of appeal, but deny as to the supplemental responses. The supplemental responses were apparently never filed with the court, and therefore were not before the trial court when it entered the judgments. We reject defendants' unsupported contention that plaintiffs were required to submit the supplemental

## II

### DISCUSSION

A. *Compensatory Damages on Default Cannot Exceed the $50,000 Amount Prayed for in the Complaint*

 1. *The Phrase "in Excess of" Does Not Provide Notice of Unlimited Damages*

In the complaint, plaintiffs sought damages "in an amount in excess of $50,000." Defendants contend the complaint thus limited recoverable compensatory damages to $50,000. We agree.

█ Former section 2023,[5] subdivision (b)(4)(A), authorized a court to strike an answer as a sanction for misuse of the discovery process. Once the answer is stricken, the case proceeds as if the defendant had never responded to the complaint. (*Greenup v. Rodman* (1986) 42 Cal.3d 822, 827–828 [231 Cal.Rptr. 220, 726 P.2d 1295] (*Greenup*).) █ Section 580, subdivision (a), limits the amount of damages a court may award whenever an answer has not been filed, or has been stricken: "The relief granted to the plaintiff, if there is no answer, cannot exceed that which he or she shall have demanded in his or her complaint, in the statement required by Section 425.11, or in the statement provided for by Section 425.115."

█ Section 425.11, subdivision (b), provides that "[w]hen a complaint is filed in an action to recover damages for personal injury or wrongful death, the defendant may at any time request a statement setting forth the nature and amount of damages being sought." Section 425.115 provides that a plaintiff may serve a statement notifying defendant of the amount of punitive damages sought in the action.[6]

█ The Legislature enacted sections 580, 425.11, 425.115, and related statutes to ensure that a defendant who declines to contest an action does not suffer open-ended liability. (*Greenup, supra*, 42 Cal.3d at p. 826.) The

responses to the court as part of their default prove-up. We also deny defendants' request for permission to file a reply to plaintiffs' opposition to the motion to augment.

 [5] Section 2023 was repealed effective July 1, 2005, and its provisions were recodified in section 2023.010 et seq. (Stats. 2004, ch. 182, § 22 [Assem. Bill No. 3081]; Stats. 2004, ch. 183, § 48 [Assem. Bill No. 3082]).

 [6] Section 425.115, subdivisions (d), (f) in relevant part, states: "A plaintiff who serves a statement on the defendant pursuant to this section shall be deemed to have complied with Sections 425.10 and 580 of this code and Section 3295 of the Civil Code. [¶] . . . [¶] The plaintiff shall serve the statement upon the defendant pursuant to this section before a default may be taken, where the motion for default judgment includes a request for punitive damages."

statutes recognize a defendant's entitlement to " ' "one 'last clear chance' " ' " to respond to the complaint and avoid the consequences of a substantial judgment. (*Schwab v. Rondel Homes, Inc.* (1991) 53 Cal.3d 428, 433 [280 Cal.Rptr. 83, 808 P.2d 226].)

The purpose of section 580 is to require the plaintiff to provide notice of the *maximum* amount of the defendant's potential liability. The complaint in the present case, however, seeks damages "in an amount in excess of $50,000."[7] Thus, rather than giving defendants notice of their *maximum* liability, the complaint instead purports to provide notice of their *minimum* liability. Other than stating that damages will be at least $50,000, the complaint provides notice no better than pleadings which seek "damages according to proof." (See *Becker v. S.P.V. Construction Co.* (1980) 27 Cal.3d 489, 494 [165 Cal.Rptr. 825, 612 P.2d 915].) Indeed, nothing in the complaint would give anyone reason to suspect a default judgment could be entered specifying compensatory damages in excess of $8 million, an amount *160 times greater* than the $50,000 expressly requested.

The present situation is distinguishable from that in our recent decision in *People ex rel. Lockyer v. Brar* (2005) 134 Cal.App.4th 659 [36 Cal.Rptr.3d 272] (*Brar*). In *Brar*, the Attorney General filed suit against an attorney who repetitively filed "shakedown" lawsuits against small businesses. Although the Attorney General's complaint sought damages "in an amount of not less than $1,000,000," we nonetheless affirmed a $1,787,500 default judgment. Because the Attorney General's complaint stated it was seeking a statutory penalty of $2,500 per violation of the unfair competition law (Bus. & Prof. Code, § 17200 et seq.), and that approximately 500 nail salons had been named as Doe defendants in each of at least three separate lawsuits, the defendant could have calculated potential damages from the face of the complaint of at least $3.75 million (i.e., $2,500 times 1,500). In the present situation, nothing in the complaint provided defendants with information sufficient to calculate compensatory damages of $8 million.

Because the complaint here is wholly ineffective under section 580 to support a default judgment in excess of $50,000, compensatory damages must be limited to that amount. (See *Becker, supra*, 27 Cal.3d at p. 492 [award reduced from $26,457.50 to $20,000.00 where complaint sought damages " 'in excess of $20,000 . . . or according to proof' "].)

---

[7] Although each of seven causes of action in the complaint seek damages "in excess of $50,000," we do not read the complaint as asserting that damages under each theory should be aggregated. Our view is consistent with plaintiffs' own reading of the complaint that "the original notice in the original Compliant [provided] that damages would be in excess of $50,000 and according to proof . . . ."

### 2. *Section 580 Applies to Default Judgments Rendered as Discovery Sanctions*

During oral argument, plaintiffs argued section 580 is inapplicable when a default judgment is entered due to discovery abuses. Plaintiffs concede the California Supreme Court in *Greenup, supra,* 42 Cal.3d 822, held section 580 applicable to a default judgment rendered as a discovery sanction, but argued at oral argument that *Greenup* adopted the default judgment procedures of section 580 only because "there was no other statute on the books that would permit a judge to enter a default judgment through any means other than 580." In making this argument, plaintiffs rely on the following quotation from *Greenup*: "It is true that sections 596, 585, and 580, which together govern default judgments, do not explicitly list answers stricken pursuant to section 2034 as proceedings in which default judgment is rendered 'as if the defendant had failed to answer . . . .' (§ 586.) Yet unless and until the Legislature specifically provides a separate procedure for defaults after discovery sanctions, these sections remain the sole statutory procedures for default judgments." (*Greenup, supra,* 42 Cal.3d at p. 828.)

Plaintiffs assert the Legislature responded by enacting section 2023 shortly after *Greenup* was decided.[8] Section 2023 provided that "[t]he court may impose a terminating sanction by one of the following orders: [¶] . . . [¶] An order rendering a judgment by default against that party." (Former § 2023, subd. (b)(4)(D).) Plaintiffs argue this provision constituted "a separate procedure for default judgments" in the discovery sanction context as envisioned by the Supreme Court in *Greenup*. We disagree.

■ Plaintiffs fail to recognize the discovery statute applicable in *Greenup*, former section 2034,[9] also provided express authority for a court to enter a default judgment as a discovery sanction. Specifically, former section 2034, subdivision (b), provided: "[T]he court may make any orders in regard to the refusal [to obey a discovery order] which are just, including, but not limited to, any of the following: An [¶] . . . [¶] order . . . rendering a judgment by default against the disobedient party." (Former § 2034, subd. (b)(2)(C).) We perceive no functional difference between section 2023 and former section 2034 as it pertains to the issue at hand. Accordingly, we reject plaintiffs' contention the Legislature effectively overruled *Greenup* by enacting section 2023, and conclude that section 580 continues to govern the amount of damages available on a default judgment entered as a discovery sanction.

---

[8] Section 2023 was enacted in 1986, and became operative on July 1, 1987. (Stats. 1986, ch. 1334, § 2, p. 4706.)

[9] Former section 2034 was repealed effective July 1, 1987. (Stats. 1986, ch. 1334, § 1, p. 4700.)

### 3. Service of a Statement of Damages Cannot Substitute for an Amended Complaint in a Non-Personal Injury/Wrongful Death Case

Defendants also argue the statement of damages served under section 425.11 did not provide effective notice that plaintiffs sought compensatory damages in excess of that pleaded in the complaint because section 425.11 applies only to personal injury or wrongful death actions. We agree with defendants on this point.

Section 425.10 requires all complaints to state the amount of damages sought, except in personal injury or wrongful death cases. The exception for personal injury and wrongful death was added in 1974 " ' "to protect the defendants from adverse publicity resulting from inflated demands, particularly in medical malpractice cases." ' " (*Debbie S. v. Ray* (1993) 16 Cal.App.4th 193, 198 [19 Cal.Rptr.2d 814].) To protect the due process rights of defendants, the Legislature simultaneously added section 425.11, which provides formal notice of the damages sought in an action for "personal injury or wrongful death." Given there is no dispute the present action is not one for personal injury or wrongful death, section 425.11 is inapplicable. As noted above, section 580, subdivision (a), provides: "The relief granted to the plaintiff, if there is no answer, cannot exceed that which he or she shall have demanded in his or her complaint, *in the statement required by Section 425.11,* or in the statement provided for by Section 425.115." (Italics added.) Because section 425.11 is inapplicable, the statement of damages was not "required by" section 425.11 and accordingly did not satisfy section 580's notice requirement.

Section 580 operates as a limitation on the court's jurisdiction. (*Greenup, supra,* 42 Cal.3d at p. 826.) In this regard, our state's highest court observed: " '[T]he court's jurisdiction to render default judgments can be *exercised only in the way authorized by statute.*' [Citation.] . . . '[C]ertainly no statutory method of procedure or limitation on power could be more clearly expressed than that set forth in section 580 of the Code of Civil procedure . . . .' [Citation.]" (*In re Marriage of Lippel* (1990) 51 Cal.3d 1160, 1167 [276 Cal.Rptr. 290, 801 P.2d 1041].) Accordingly, default judgments rendered in violation of section 580 are void. (*Greenup, supra,* 42 Cal.3d at p. 826.) In this vein, courts have held that due process requires not only actual notice of the damages being sought, but "formal notice." (*Ibid.*) As one court observed: "Section 580 constitutes a statutory expression of the mandates of due process, which require 'formal notice of potential liability.' [Citations.]" (*Parish v. Peters* (1991) 1 Cal.App.4th 202, 207 [1 Cal.Rptr.2d 836].) Thus, courts have subjected section 580 to a "strict construction." (*Greenup, supra,* 42 Cal.3d at p. 826.) Strictly construed, serving a statement of damages cannot satisfy section 580 in an action not involving personal injury or wrongful death.

■ We recently addressed this issue in *Sole Energy Co. v. Hodges* (2005) 128 Cal.App.4th 199 [26 Cal.Rptr.3d 823] (*Sole Energy*). In *Sole Energy*, we reversed a $27 million default judgment because the moving party failed to specify it sought a terminating sanction in the notice of motion for sanctions. We also reversed the judgment because the complaint failed to specify the amount of damages sought. Although plaintiffs served a statement of damages under section 425.11, we concluded this failed to meet the demands of section 580, observing: "Statements of damages are used only in personal injury and wrongful death cases, in which the plaintiff may not state the damages sought in the complaint. [Citation.] In all other cases, when recovering damages in a default judgment, the plaintiff is limited to the damages specified in the complaint." (*Sole Energy, supra*, 128 Cal.App.4th at p. 206, fn. 4.)[10]

■ Because the complaint in the present case did not seek damages for personal injury or wrongful death, plaintiffs' statement of damages fails to provide the formal notice required before plaintiffs may obtain compensatory damages exceeding the amount requested in the complaint. Consequently, we must reverse the judgment. Ordinarily, we would reduce the award to $50,000, the amount specifically requested in the complaint. (See *Ostling v. Loring* (1994) 27 Cal.App.4th 1731, 1743 [33 Cal.Rptr.2d 391] (*Ostling*) ["Ordinarily when a judgment is vacated on the ground the damages awarded exceeded those pled, the appropriate action is to modify the judgment to the maximum amount warranted by the complaint"].) But here we must vacate the award in its entirety because the trial court applied an incorrect measure of damages. (See our discussion, *post*.) Our reversal of the default judgment, however, does not vacate the default itself. (See *Ostling, supra*, 27 Cal.App.4th at pp. 1744–1745.)

We recognize plaintiffs obtained the default judgment before publication of *Sole Energy*, the first reported decision addressing the issue here. In the interest of fairness, plaintiffs should have the option of either proceeding with a new default prove-up with the $50,000 damage limitation, or amending the complaint to state the full amount of damages they seek. (See *Greenup, supra*, 42 Cal.3d at pp. 830–831.) If plaintiffs select the latter option, the default will be vacated, entitling defendants to either attack the pleadings, or answer the amended complaint. (See *Falahati v. Kondo* (2005) 127 Cal.App.4th 823, 831 [26 Cal.Rptr.3d 104].)

---

[10] Plaintiffs cite *Lang v. Hochman* (2000) 77 Cal.App.4th 1225 [92 Cal.Rptr.2d 322], where the court, in a case not involving personal injury or wrongful death, issued a verdict in excess of the amount requested in the complaint because the plaintiff served a notice of damages under section 425.11. The published portions of *Lang* neither include these facts nor discuss this issue. Thus, *Lang* does not support plaintiffs' proposition.

### 4. *Plaintiffs Satisfied Notice Requirements for Punitive Damages*

■ Although plaintiffs' statement of damages failed to provide formal notice of the amount of compensatory damages they sought, the notice of punitive damages fully met the requirements of formal notice. Specifically, the rule that punitive damages cannot be included in the complaint applies to all cases requesting punitive damages. (See Civ. Code, § 3295, subd. (e).) Section 425.115, subdivision (f), provides that a party may serve a notice of punitive damages at any time before default is entered. Plaintiffs served their notice of punitive damages concurrently with their motion for terminating sanctions. Because service occurred before the entry of default, the notice of punitive damages was timely.

Defendants complain that service in this manner violated their due process rights because the first formal notice of the amount of punitive damages occurred *after* they had made the decision to "redact" the computer hard drives.[11] In other words, defendants argue they would not have misused the discovery process had they known their liability could reach $24 million. The argument implicitly suggests that had they received proper notice and chosen not to participate in the lawsuit, they also had the option to destroy the evidence requested in discovery. We reject this contention.

■ There is a significant difference between choosing not to defend a lawsuit at all, and defending a lawsuit by willfully disobeying lawful discovery orders. Defendants willing to accept known liability may properly elect to watch from the sidelines. But if a defendant chooses to participate, he or she must play by the rules. Here, defendants' destruction of evidence violated the court's discovery order and deliberately thwarted plaintiffs' legitimate efforts to obtain information about damages. Defendants' obligation to obey court orders to produce documents exists whether or not they have received notice of the amount of damages plaintiffs seek; therefore, defendants do not have the option to ignore the court's order. We cannot endorse a litigant's conscious decision to deliberately destroy evidence— based on the perception damages are limited to a particular amount.

Accordingly, we conclude the notice of punitive damages was fully effective to apprise defendants of the amount of the punitive damages being sought. Nonetheless, because we vacate the trial court's award of compensatory damages, we must also vacate the punitive damage award. Of course, the trial court must reconsider the amount of punitive damages if plaintiffs elect to proceed on the $50,000 compensatory damage limitation.

---

[11] The defendants also contend the statement of damages was not timely served. Because we have already determined the statement of damages did not constitute formal notice of the compensatory damages being sought, we address only the timeliness of the notice of punitive damages.

B. *The Facts Pleaded in the Complaint Fail to Support Causes of Action for Misappropriation of Trade Secrets and Breach of Fiduciary Duty**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

C. *The Trial Court Erred in Awarding as Compensatory Damages the Value of EPT*

The trial court awarded $8,040,272.19 in compensatory damages. Plaintiffs based their compensatory damage claim on the conclusions of their expert witness, who used two different methods of calculating EPT's value. The first method compared six similar publicly traded companies to EPT. Using publicly available information, the expert calculated a price-to-revenue ratio for each company, which yielded a mean price-to-revenue ratio of 2.13. The expert then applied this ratio to an estimate of EPT's annual revenue, $15,391200, which yielded a result of $32,783,256. The expert then multiplied this figure by 50 percent, as a discount for EPT's status as a privately held company, for a value of $16,391,628.

Alternatively, the expert performed a discounted cash-flow analysis using as a basis two months of EPT's bank statements. Applying capital expenditure assumptions and a variety of discount factors yielded a value of $13,650,996. The expert then averaged both final values to determine a final valuation of $15,021,317. The trial court reduced this number to $8,040,272.19, the amount set forth in the statement of damages.

Defendants contend the trial court erred in awarding as damages the estimated market value of EPT, instead of awarding EFS its lost profits. We agree.

"It is imperative in a default case that the trial court take the time to analyze the complaint at issue and ensure that the judgment sought is not in excess of or inconsistent with it. It is not in plaintiffs' interest to be conservative in their demands, and without any opposing party to point out the excesses, it is the duty of the court to act as gatekeeper, ensuring that only the appropriate claims get through." (*Heidary v. Yadollahi* (2002) 99 Cal.App.4th 857, 868 [121 Cal.Rptr.2d 695] (*Heidary*).) In the present case, the judgments not only included a cash award representing the value of EPT, but also provided injunctive relief preventing EPT from doing any further business with former and prospective EFS clients, with whom EPT did not already have a legally binding contract. The court appointed a receiver to ensure EPT complied with this and other provisions in the judgment.

*See footnote, *ante*, page 1161.

■ Plaintiffs premise their damages on the theory that because EPT took all of EFS's clients, equipment, and trade secrets, the value of EPT should approximate what EFS has lost. This presumes virtually all of EPT's current clients are either former clients or prospective clients of EFS, and the scope of EPT's current business is no broader than that of EFS. The lack of such evidence in the record aside, plaintiffs have cited no legal authority to support a damage award equaling the current value of defendants' business, and we are aware of none.[12] In their default prove-up papers, plaintiffs cited *Brandon & Tibbs v. George Kevorkian Accountancy Corp.* (1990) 226 Cal.App.3d 442 [277 Cal.Rptr. 40] (*Brandon & Tibbs*) as setting forth the appropriate legal standard for "loss of an entire business." *Brandon & Tibbs*, however, held the plaintiff may recover only the profits lost, not the value of the lost business.[13] (*Id.* at pp. 456–459; see also *Elsbach v. Mulligan* (1943) 58 Cal.App.2d 354, 365–367 [136 P.2d 651] ["The measure of damages for the diminution of the value of business due to a wrongful act is 'reflected by loss of profits, expenses incurred or similar concrete evidences of injury' "].)

■ Damage awards in injury to business cases are based on net profits. (See, e.g., *Kuffel v. Seaside Oil Co.* (1970) 11 Cal.App.3d 354, 366 [90 Cal.Rptr. 209] ["It is fundamental that in awarding damages for the loss of profits, net profits, not gross profits, are the proper measure of recovery"].) " ' "Net profits are the gains made from sales 'after deducting the value of the labor, materials, rents, and all expenses, together with the interest of the capital employed.' [Citation.]" ' [Citations.]" (*Kids' Universe, supra*, 95 Cal.App.4th at p. 884.) " 'Lost anticipated profits cannot be recovered if it is uncertain whether any profit would have been derived at all from the proposed undertaking. But lost prospective net profits may be recovered if the evidence shows, with reasonable certainty, both their occurrence and extent. [Citation.] It is enough to demonstrate a reasonable probability that profits would have been earned except for the defendant's conduct. [Citations.]' Moreover, . . . a plaintiff is 'not required to establish the amount of its damages with absolute precision . . . . [Citation.]' [Citations.]" (*Kids' Universe, supra*, 95 Cal.App.4th at pp. 883–884.)

---

[12] Moreover, given the court's determination that EPT prospered from dealing with EFS's former clients and potential clients, it would be fundamentally unfair to require defendants to pay plaintiffs the full value of EPT and also require EPT to sever its relationship with some or all the clients who presumably created EPT's value. To the extent these clients return to EFS, plaintiffs have received a double recovery proscribed by the law. (Cf. *Croeni v. Goldstein* (1994) 21 Cal.App.4th 754, 759–760 [26 Cal.Rptr.2d 412].) Put another way, the trial court required EPT to pay its own value as a company, and then issued an injunction potentially destroying some or all of the company's value.

[13] *Brandon & Tibbs* involved damages for breach of contract. Nonetheless, the principle of recovering lost profits for loss of a business applies equally well to tort actions. (See *Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 883–884 [116 Cal.Rptr.2d 158] (*Kids' Universe*).)

Defendants contend EFS was never profitable, and therefore cannot demonstrate any lost profit damages. Classifying EFS as a new and unestablished business, defendants assert that any lost profits would be "uncertain, contingent, and speculative." We disagree that plaintiffs are necessarily foreclosed from obtaining an award of lost profits.

Lost profits for an unestablished business are recoverable if based on reasonably reliable evidence. " '[W]here the operation of an *established business* is prevented or interrupted, as by a tort or breach of contract or warranty, damages for the loss of prospective profits that otherwise might have been made from its operation are generally recoverable for the reason that their occurrence and extent may be ascertained with reasonable certainty from the past volume of business and other provable data relevant to the probable future sales. [Citations.] On the other hand, where the operation of an *unestablished business* is prevented or interrupted, damages for prospective profits that might otherwise have been made from its operation are not recoverable for the reason that their occurrence is uncertain, contingent and speculative. [Citations.] . . . But although generally objectionable for the reason that their estimation is conjectural and speculative, anticipated profits dependent upon future events are allowed where their nature and occurrence can be shown by evidence of reasonable reliability. [Citations.]' " (*Kids' Universe, supra*, 95 Cal.App.4th at p. 883.)

The party seeking to recover lost profits from an unestablished business must demonstrate with reasonable certainty the basis for the claim. This generally requires expert testimony concerning " 'economic and financial data, market surveys and analyses, business records of similar enterprises' " or " 'general business conditions and the degree of success of similar enterprises.' " (*Kids' Universe, supra*, 95 Cal.App.4th at p. 884.) According to the complaint's allegations, which are accepted as true because of the default, defendants essentially stole EFS's business methods, customers, contacts, licenses, office, and equipment and used it to form EPT. Accordingly, EPT's business experience is, contrary to defendants' assertions, unquestionably relevant and may, depending on the proof submitted, provide a basis for determining EFS's lost profits.

We recognize that demonstrating lost profits is not always an easy task. This is certainly true here, where defendants deliberately thwarted legitimate discovery. The special circumstances of a particular case may allow the court more latitude in estimating damages, particularly where the difficulty in estimation arises from the defendant's bad faith. (See *Elsbach, supra*, 58 Cal.App.2d at p. 366.) A wrongdoer cannot complain if his or her conduct " 'creates a situation in which the court must estimate rather than compute [damages]. [Citations.]' [Citation.]" (*Sanchez-Corea v. Bank of America* (1985) 38 Cal.3d 892, 908 [215 Cal.Rptr. 679, 701 P.2d 826].)

D. *The Scope of the Claims Proved Did Not Differ From That Pleaded in the Complaint*

 The complaint delimits the legal theories a plaintiff may pursue and the nature of the evidence which is admissible. (*Ostling, supra,* 27 Cal.App.4th at pp. 1744–1745.) "The court cannot allow a plaintiff to prove different claims or different damages at a default hearing than those pled in the complaint." (*Heidary, supra,* 99 Cal.App.4th at p. 868.)

Defendants complain plaintiffs departed from the facts, legal theories, and damages alleged in their complaint. Specifically, defendants complain plaintiffs relied on evidence not in existence at the time the complaint was filed, and pursued a breach of contract theory not pleaded. Defendants contend these departures constituted a de facto amendment and automatically opened the default taken against them. We disagree.

 Defendants rely on *Jackson v. Bank of America* (1986) 188 Cal.App.3d 375, 390 [233 Cal.Rptr. 162] (*Jackson*), in support of their claim that any request for relief outside of that pleaded in the complaint constitutes a "de facto amendment" of the complaint and opens the default. *Ostling* specifically rejected this notion. There, the appellate court concluded that where the relief sought exceeds that pleaded in the complaint, the appropriate remedy is to reverse the judgment, but leave the default in place. This approach protects a defendant "without the semantic alchemy" of turning an overbroad default proveup into a de facto amendment. (*Ostling, supra,* 27 Cal.App.4th at p. 1747.) We agree with *Ostling* and therefore reject defendants' argument based on *Jackson.*

 Moreover, defendants fail to explain why evidence presented in a prove-up hearing must be limited to that available at the time the complaint was filed. There is no reason to exclude evidence which tends to prove the allegations in the complaint simply because of its nonexistence or unavailability when the complaint was filed.

Finally, we disagree that plaintiffs advanced a breach of contract theory to support their damages at the time of the default proveup. True, plaintiffs relied on several breach of contract cases in arguing damages. But these cases also apply to tort damages when measuring similar loss of business claims. Nothing in the record suggests plaintiffs relied on a breach of contract theory to obtain the damage award.

E. *Plaintiffs Were Not Entitled to Treble Damages*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[*]See footnote, *ante,* page 1161.

### F. *The Trial Court Did Not Violate Defendants' Due Process Rights by Issuing Terminating Sanctions*

Defendants contend the trial court violated their rights to due process by issuing the terminating sanction. We disagree.

 Former section 2023, subdivision (a), provided that disobedience of a court order constituted a misuse of the discovery process, for which the court could impose sanctions, including a terminating sanction such as dismissal. (Former § 2023, subd. (b).) "Dismissal is a proper sanction to punish the failure to comply with a rule or an order only if the court's authority cannot be vindicated through the imposition of a less severe alternative. [Citations.] For instance, when the rule or order violated concerns discovery, the trial court may impose sanctions that ' " 'are suitable *and necessary* to enable the party seeking discovery to obtain the objects of the discovery he [or she] seeks but the court may *not* impose sanctions which are designed *not to accomplish the objects of the discovery but to impose punishment.*' " ' " (*Rail Services of America v. State Comp. Ins. Fund* (2003) 110 Cal.App.4th 323, 331–332 [1 Cal.Rptr.3d 700].) In other words, discovery sanctions exist "not to provide a weapon for punishment for past violations or penalty for past conduct but to secure compliance with orders of the court." (*Welgoss v. End* (1967) 252 Cal.App.2d 982, 992 [61 Cal.Rptr. 52].)

 A court's decision to impose a particular sanction is "subject to reversal only for manifest abuse exceeding the bounds of reason." (*Kuhns v. State of California* (1992) 8 Cal.App.4th 982, 988 [10 Cal.Rptr.2d 773].) Defendants point out that a number of lesser sanctions available under section 2023 would have accomplished the purposes of discovery, such as an adverse inference instruction to the jury. Although the trial court had the discretion to impose a lesser sanction, our task is not to supplant our own judgment for that of the trial court, but to ascertain whether the trial court abused its discretion by imposing a terminating sanction.

The record provides ample support for the trial court's actions. Specifically, plaintiffs were forced to repeatedly file motions to compel on three sets of document requests and two sets of specially prepared interrogatories. With one exception, the court granted each of the motions and imposed monetary sanctions. Defendants' persistent failure to comply with the court's discovery orders resulted in a discovery stay and continuance of the trial. Significantly, in one of its discovery orders imposing monetary sanctions, the trial court specifically warned defendants, in capital letters no less, that any further failure to comply with the court's discovery orders could result in terminating

sanctions. Although plaintiffs based their motion for terminating sanctions on a host of discovery abuses, one in particular demonstrates the egregious nature of their actions.

Category No. 4 of plaintiffs' second document inspection demand sought: "The computer as to which the supplement to the prior Document Demand indicates that various e-mails were destroyed by a virus." This category references defendants' claim that they were unable to produce certain e-mail messages responsive to plaintiffs' first demand because a computer virus had, between the time of the request and defendants' production, destroyed the e-mails. Defendants undoubtedly understood that plaintiffs sought production of the computer's physical hard drive to recover whatever portion of the allegedly damaged or destroyed e-mails still existed. Defendants failed to object to this category, but simply requested plaintiffs image the computer on site at defendants' offices.

Despite defendants' tacit agreement to furnish the documents and the court's order that defendants produce the responsive materials in their entirety, coupled with an express warning that the court would impose terminating sanctions if defendants failed to comply, defendants took it upon themselves to run a "Data Eraser" program on the disk, in an apparent attempt to destroy the e-mails responsive to the previous document request. Plaintiffs recovered e-mails from the computer only because defendants had not run the program properly.

Given defendants' brazen violation of a discovery order in the face of an express warning that terminating sanctions could be issued, the trial court could have reasonably concluded a lesser sanction would not have been sufficient to compel compliance and that terminating sanctions were necessary to provide plaintiffs' with the due process to which they were equally entitled.

Defendants' contention that evidence of spoliation was lacking is specious. As the trial court noted, defendants' actions have made it virtually impossible to determine what items defendants destroyed. The mere fact plaintiffs' forensic consultant recovered some of the data does not mean none was lost.

Defendants argue plaintiffs were required to show prejudice from the deletion of the data. (See, e.g., *McArthur v. Bockman* (1989) 208 Cal.App.3d 1076, 1080–1081 [256 Cal.Rptr. 522].) Otherwise, they contend, terminating sanctions bestow a windfall to plaintiffs. But defendants' own actions make that showing difficult, if not impossible. In any event, defendants' misuse of the discovery process has been pervasive and consistent. Because ample evidence in the record supports the decision to grant terminating sanctions, we hold the trial court did not abuse its discretion.

## III

### DISPOSITION

The judgment is reversed, and the cause remanded with instructions to vacate the award of compensatory and punitive damages. The trial court shall conduct a new damages prove-up hearing to determine the amount of EFS's lost profits, if any, limited to a maximum of $50,000, and the amount of any punitive damages. Alternatively, plaintiffs may elect to amend their complaint to increase the amount of compensatory damages being sought, at which point defendants' default will be opened. Parties are to bear their own costs.

Bedsworth, Acting P. J., and Fybel, J., concurred.