Filed 1/12/21  Elfstrom v. Wood CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

HEIDI ELFSTROM et al.,

    Plaintiffs and Respondents,

v.

HOLLY WOOD,

    Defendant and Appellant.

E071531

(Super.Ct.No. PROPS1400492)

OPINION

APPEAL from the Superior Court of San Bernardino County.  Stanford E. Reichert, Judge.  Affirmed.

Law Offices of Steven Rein and Steven Rein for Defendant and Appellant.

Heidi Clair-Elfstrom and Jackie Nutting, in pro. per., for Plaintiffs and Respondents.

This action was initiated based on the alleged mismanagement of the Jack Whitey Clair Revocable Trust (the trust), by the original trustee, defendant and appellant

1

Holly Noel Wood.[1]  The trust was created for the benefit of Jack and Helen Clair's five children:  Jackie Lynn Nutting, Terry Lee Cotton, Wesley Norman Clair, Holly, and Heidi Renee Elfstrom.  On June 16, 2014, plaintiffs and respondents Heidi, Wesley,[2] and Jackie petitioned for an accounting of the trust, to remove and surcharge trustee for breach of fiduciary duty, to transfer assets, and to impose a constructive trust/equitable lien on the trust assets.  After three years and nine months of Holly's repeated delay tactics and failure to comply with court orders, the trial court dismissed her objections and defenses and entered judgment in the amount of $65,967.15.  On appeal, Holly contends the court erred by issuing terminating sanctions against her, and the award of $65,967.15 violates prejudgment attachment laws.  We affirm.

## I.  PROCEDURAL BACKGROUND AND FACTS

Throughout Jack and Helen's marriage, Helen was "responsible for taking care of the family finances, paying bills, [and] balancing a checkbook" until her death in 1998.  After her death, "Holly stepped in and started doing everything for [Jack] regarding finances."  At that time, Jack owned two pieces of real property:  (1) 3017 North Evelyn Avenue in Rosemead (Evelyn property); and (2) 2737 Del Mar Avenue in Rosemead (Del Mar property).  Holly informed Heidi that she wanted to take Jack "to see the attorney who drew up her family's trust to have a trust set up for him to protect the house."  Thus, on April 29, 2002, Jack executed a will, created the trust, and designated

---

[1]  We use first names after initial introduction to avoid confusion.  No disrespect is intended.

[2]  Wesley passed away on March 17, 2019.

2

Holly as his attorney-in-fact for property issues, in the event of his "incapacity." The will called for the distribution of Jack's personal property in equal shares to his five children, and the rest, along with the Evelyn property,[3] was to be transferred into the trust. Jack wanted to protect the Evelyn property so that it would pass to his children upon his death. The original beneficiary of the trust was Jack; however, upon his death, the trust assets were to be distributed in equal shares to his children.

In 2003, the Evelyn property was sold and the proceeds were used to purchase a house located at 400 N. Laurel Avenue in Upland (Laurel property). Holly told her sister Heidi that selling the Evelyn property "would free [Jack] up, give him some extra income by using that money to purchase an investment property so he can have rental income." Neither Holly nor her husband provided any money to purchase the Laurel property. Nonetheless, title to the Laurel property was taken in the name of "John R. Wood, Trustee and Holly N. Wood, Trustee, of the John R. and Holly N. Wood Trust, established May 5, 1999." When Heidi discovered that the Laurel property was in Holly's family trust, she spoke to Jack, who had no knowledge "his trust was not the owner of the Laurel property." The Laurel property provided rental income; however, "Holly didn't keep a clear record of who was collecting rents." Jack lived at the Laurel property or with Terry until 2008, when he moved to an assisted living facility.

---

[3] Jack executed a quitclaim deed for the Evelyn property from himself as "widower" to himself as trustee of the trust; however, Holly was named trustee, and the deed was never recorded.

Jack died on January 12, 2013. Following his death, plaintiffs were lead to believe that Holly was going to sell the Laurel property and distribute the proceeds according to the terms of the trust. However, Holly and her husband sold the Laurel property and received $239,076.58, which they used "for living expenses, to pay bills and loans, and to pay for [Holly's] twins' college expenses." Following the sale, Holly "halted all communication with [her siblings]. She stopped responding to everything."

Although plaintiffs believed "the trust was in place [and] it was valid," Holly failed and refused to distribute any of the proceeds from the sale of the Laurel property or provide an accounting of the trust. Thus, after 18 months of no accounting, plaintiffs filed the petition seeking, inter alia, to compel an accounting of the trust and surcharge the trustee for breach of fiduciary duties. Holly filed an objection and response on October 14, 2014. Two months later, she filed a final accounting wherein she stated that she was "not aware of any assets or any distributions from the trust." On December 17, the court removed Holly as trustee, ordered her to immediately turn over all assets and records for the trust, and to avoid encumbering, transferring, selling, or otherwise diminishing the trust assets. Trial was set for July 14, 2015; however, it was continued several times because Holly had failed to respond to discovery requests, was out of state, was not prepared, or she had substituted in new counsel to represent her. Holly was sanctioned $1,460 for failing to provide discovery responses and $2,672 for failing to appear at the mandatory settlement conference (MSC).

On February 29, 2016, a new trial date was set for July 15, 2016, with an MSC on May 17, 2016. However, the MSC was rescheduled two times because Holly was

4

unavailable due to a death in the family and due to her being "the victim of a theft wherein her identification and all her credit cards were taken." On July 5, Holly informed the court that she was not ready for trial, was planning on meeting with an attorney later that week, and requested a continuance. The matter was continued to December 5, 2016.

On December 5, 2016, Holly unsuccessfully moved to dismiss the petition for lack of jurisdiction, and the trial commenced. On the third day of trial, the parties requested an MSC, but no settlement was reached. On February 21, 2017, the court granted plaintiffs' ex parte application and chose July 18, 2017, to resume trial; however, that date was vacated, and a trial setting conference (TSC) was set for August 14, 2017.

On July 21, 2017, plaintiffs requested the trial court order Holly to deposit the sum of $333,742.44 in a blocked account in order to protect the proceeds and profits of Jack's estate. Holly opposed the request on the grounds she did not breach her fiduciary duty while acting as trustee. She claimed that Jack "of his own free will and without any influence by [her], . . . revoked the funding of his trust and transferred funds from the sale of the Evelyn Property, outside the trust, to fund an escrow of the Laurel property being purchased by the John R. and Holly N. Wood Trust." Holly claimed Jack gifted her with the sole asset of the trust because he wanted to repay her for her "kindness" and assistance, and because Holly's siblings had "illegally taken out substantial loans in [Jack's] name" resulting in "$200,000 dollars in judgments against" him and fraudulently removed him from the title to the Evelyn property. However, the documents attached to

5

Holly's opposition failed to show any fraudulent actions occurring after Jack created the trust to benefit all of his children.

On August 14, 2017, Holly presented the court with a "doctor's note that reflects that appointment is set on August 18, 2017." The TSC was rescheduled for September 11. On September 11, Holly informed the court that she "has a doctor's appointment . . . on 9/13/17." The court continued the TSC to October 23. Holly failed to appear on October 23, and the TSC was continued to December 11.

On October 26, 2017, the trial court ordered Holly to deposit the amount of $123,670.29 into a blocked account and set a hearing regarding the status of the blocked account for November 30. On November 29, Holly filed a declaration in which she stated that she did not have the "ability to come up with any significant cash from bank accounts or other liquid assets." She stated that she "own[s] or ha[s] an interest" in the following real properties: (1) a home in Upland, but there is "no equity," and she would not qualify for a loan on the property; (2) two properties in Arkansas, which have no equity but provide rental income she uses "for living expenses"; and (3) her husband's property in Mt. Baldy, which "is leased land owned by the U.S. Department of Forestry, [and] by law cannot be encumbered." Regarding the Laurel property, Holly stated that she used the proceeds from its sale for "living expenses, to pay bills and loans, and to pay for our twins' college expenses, and that money is long gone."

On November 30, 2017, the court set an order to show cause (OSC) for December 7, regarding contempt based on Holly's failure to comply with the court's order to deposit $123,670.29 into a blocked account. However, the court later vacated

6

the OSC, advanced the TSC, and set a hearing on terminating sanctions for May 10, 2018. The court directed the parties to file briefs on the issue of why the "court should not impose terminating sanctions including a judgment for failure to comply with the court's order."

On January 24, 2018, Holly objected to terminating sanctions, and the previously imposed monetary sanctions, on the grounds that (1) she does not "have the ability to come up with any significant cash from bank accounts or other liquid assets to pay any of the sanctions ordered," (2) the Laurel property was never placed in the trust, (3) the October 26, 2017 order "was essentially a pre-judgment attachment order" and was not authorized under "C.C.P. §483.010," nor were the proper procedures followed to obtain a prejudgment attachment order, (4) the "February 25, 2015 [sanctions] for $1,460.00" was caused by "the mishandling of the case by the Jacobovitz law firm and their misrepresenting themselves as my counsel," and (5) the "May 27, 2015 [sanctions] for $2,672.00" were in error because she filed discovery responses as part of the amended trustee final accounting. In response, plaintiffs argued Holly "has consistently delayed this action, failed to participate in this action and repeatedly failed to meet her obligations to produce accountings, to attend hearings, to show up prepared for trial, to deposit estate proceeds into a blocked account pursuant to the October 26, 2017 Order, and has willfully and continuously failed and refused to pay any of the monetary sanctions ordered against her."

On May 10, 2018, the trial court issued the following ruling: "[Holly's] explanation for failure to comply with the Court's order to deposit the money boils down

7

to her simply saying, I've spent all my money, including the money I received as alleged breach of my fiduciary duties from the sale of the Evelyn Street and Laurel Street houses and I wanted to spend my money on other things.  [¶]  This is a practical reason for failure to comply with the Court's order but not a legal excuse.  Therefore, as the Court of Equity . . . the Court sees no point in the prosecution of this legally futile case which was filed on June 16, 2014, almost four years ago, and on which [Holly] has delayed the trial over and over again.  [¶]  Therefore, the Court orders terminating sanctions as follows:  All objections and defenses of [Holly] to the petition are dismissed.  One-half of the money the Court ordered deposited, which equals $61,835.15 plus the unpaid sanctions of $4,132 for a total of $65,967.15 are ordered as sanctions and a judgment on the petition."

The judgment was filed July 24, 2018, and Holly filed a notice of appeal October 1, 2018.

## II.  DISCUSSION

### A.  *Propriety of Terminating Sanctions*

Holly contends the trial court abused its discretion by issuing terminating sanctions because "[t]he strength of the facts, evidence and legal authority supporting [her] position so far outweigh[] any merits to the position of respondents."  We are not persuaded.

"Trial courts have inherent authority to control the proceedings before them.  [Citation.]  This includes the authority to impose a terminating sanction where a party willfully violates the court's orders.  [Citations.]  In reviewing the order, 'our task is not

8

to supplant our own judgment for that of the trial court, but to ascertain whether the trial court abused its discretion by imposing a terminating sanction.' [Citations] The question 'is not whether the trial court should have imposed a lesser sanction; rather, the question is whether the trial court abused its discretion by imposing the sanction it chose.'" (*Osborn v. Todd Farm Service* (2016) 247 Cal.App.4th 43, 53-54; see Code Civ. Proc., § 128, subd. (a)(8) [every court shall have the power to "amend and control its process and orders so as to make them conform to law and justice"]; Code Civ. Proc., § 187 ["When jurisdiction is, by the Constitution or this Code, or by any other statute, conferred on a Court or judicial officer, all the means necessary to carry it into effect are also given; and in the exercise of this jurisdiction, if the course of proceeding be not specifically pointed out by this Code or the statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this Code."].)

Here, the requirements for terminating sanctions were met: The case was almost four years old, Holly failed to provide accountings, failed to attend hearings, delayed the trial over and over again, failed to deposit the sum of $123,670.29 into a blocked account after the trial court ordered her to do so, and offered nothing more than a practical reason (she spent all her money, including the money from the sale of the Evelyn and Laurel properties) for her failure to do so. In addition, Holly's noncompliance prejudiced plaintiffs who had to expend money in attorney fees in their efforts to obtain discovery and litigate her actions as trustee of the trust.

Holly does not deny that the proceeds from the sale of the Evelyn property were used to purchase the Laurel property or that she used all the proceeds from the sale of the

9

Laurel property. Rather, she claims that (1) title to the Evelyn property was never transferred from Jack to the trust, (2) "a meaningful trust was never created," and (3) Jack wanted her and her husband to use the proceeds from the sale of the Evelyn property to purchase the Laurel property. However, those are issues to be decided by the trial court, not her. "We agree that strict standards must be met before terminating sanctions are appropriate: 'A decision to order terminating sanctions should not be made lightly. But where a violation is willful, preceded by a history of abuse, and the evidence shows that less severe sanctions would not produce compliance with the [court's order and] rules, the trial court is justified in imposing the ultimate sanction.'" (Cf. *Moofly Productions, LLC v. Favila* (2020) 46 Cal.App.5th 1, 12 [discussing party's failure to comply with discovery rules].) Holly's conduct was sufficiently egregious to warrant the imposition of this most extreme sanction. She effectively refused to participate in the litigation of the issues raised in the petition or pay the monetary sanctions ordered against her, leaving plaintiffs unable to effectively prosecute their claims. Even then, Holly failed to deposit $123,670.29 into a blocked account as ordered by the trial court. There is ample support for the court's statement that there is "no point in the prosecution of this legally futile case which was filed on June 16, 2014, almost four years ago, and on which [Holly] has delayed the trial over and over again."

B.      *Violation of California's Prejudgment Attachment Laws.*

Holly asserts the award of $65,967.15 violates prejudgment attachment laws. Not so. The award was a terminating sanction that was less than the amount demanded in the petition.

10

Trial courts possess the inherent power to dismiss an action for unreasonable, inexcusable delay in prosecution.  (See *Stephen Slesinger*, *Inc. v. Walt Disney Co.* (2007) 155 Cal.App.4th 736, 758-765, 764 ["The decision whether to exercise the inherent power to dismiss requires consideration of all relevant circumstances, including the nature of the misconduct (which must be deliberate and egregious, but may or may not violate a prior court order), the strong preference for adjudicating claims on the merits, the integrity of the court as an institution of justice, the effect of the misconduct on a fair resolution of the case, and the availability of other sanctions to cure the harm."]; see also Cal. Const., art. VI, § 1; Code Civ. Proc., § 583.150 ["This chapter does not limit or affect the authority of a court to dismiss an action or impose other sanctions under a rule adopted by the court pursuant to Section 575.1 or by the Judicial Council pursuant to statute, or otherwise under inherent authority of the court."].)  "Except to the extent [the Probate Code] provides applicable rules, the rules of practice applicable to civil actions," under the Code of Civil Procedure, apply to and constitute the rules of practice in proceedings under the Probate Code.  (Prob. Code, § 1000, subd. (a).)  Code of Civil Procedure section 580, subdivision (a), limits the amount of damages a court may award whenever an answer has not been filed, or has been stricken:  "The relief granted to the plaintiff, if there is no answer, cannot exceed that demanded in the complaint . . . ."[4]

---

[4]  Although Code of Civil Procedure section 580 does not refer to a complaint, and plaintiffs filed a petition under the Probate Code, Code of Civil Procedure section 580 is a "'statutory expression of the mandates of due process, which require "formal notice of potential liability."'" (*Electronic Funds Solutions*, *LLC v. Murphy* (2005) 134 Cal.App.4th 1161, 1176.)  The same fundamental due process considerations apply whether the suit is initiated by petition under Probate Code section 850 or by a complaint.

11

Here, the petition identified $273,500 as the amount of proceeds realized from the sale of the Laurel property, which should have been placed in the trust.  This amount more than supports a default judgment in the amount of $65,967.15.

## III.  DISPOSITION

The judgment of the trial court is affirmed.  Respondents are awarded their costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
J.

We concur:

RAMIREZ
P. J.

MILLER
J.