Filed 12/30/15  Woodell v. Bernstein CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JOHN WOODELL,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>CHARLES D. BERNSTEIN et al.,<br><br>        Defendants and Respondents. | A142836<br><br>(San Mateo County<br>Super. Ct. No. CIV517287) |

        John Woodell sued Charles D. Bernstein and Virginia Chang Kiraly (collectively, defendants) for defamation and conspiracy.  The trial court imposed terminating sanctions against Woodell for spoliation of evidence and dismissed his lawsuit with prejudice.  Woodell appeals and contends his removing information from his cell phone did not warrant terminating sanctions.  We affirm the judgment.

### BACKGROUND

        Woodell was a web developer for Google, Inc. (Google)[1] in October 2011.  At the time of the incident underlying this lawsuit, his wife, Kirsten Keith, was vice mayor of Menlo Park.  Saturday night, on October 15, 2011, Woodell discovered his cell phone was missing.  He had used the phone earlier in the evening, and asserted that the battery was depleted at the time it went missing.  He believed that he might have lost the phone while walking his dog.

---

        [1]  Woodell's employment with Google ended in October 2012.

Kiraly was campaigning and running for a position on the Menlo Park Fire Protection District Board (the Fire Board).  Bernstein, who lived on the same block as Woodell, had one of Kiraly's political campaign signs (the sign) planted in the ground in the front yard of his home in Menlo Park.  Bernstein and his wife had left town the morning of October 15, 2011, and returned the afternoon of October 17, 2011.  When they returned home, Bernstein discovered that the sign had been moved and discarded behind a juniper bush in his yard.  Next to the sign, Bernstein found a black Samsung cell phone (the phone) and noticed the words, "Woodell" and "Woodell family" scrolling across the top of its screen.

After discovering the phone, Bernstein sent Kiraly an email, which stated in pertinent part:  "I want you to think about what I'm about to tell you.  [¶]  I worked out tonight and went out to run around 6:15 [p.m.]  I decided to put up your sign that had been taken down and thrown behind a fence hedge.  When I picked up the sign, I found a cell phone just behind the sign (and behind the hedge where no one could possibly be unless they were fooling around).  [¶]  It had occurred to me that the only person I knew on our street who might take down the sign was John Woodell.  I laughed to myself that it would be funny if the phone belonged to John.  [¶]  I tried to open the Google phone, but I could not.  So, I went running.  [¶]  When I returned, I played with the phone.  I got it to open and it has a little preview section in the upper left-hand corner of the screen.  Suddenly, three message[s] went through it, one of which was from 'the Woodell family.'  Another appears to be from Woodell's sister.  While I cannot be 100 [percent] certain, it does appear to be John Woodell's cell phone.  [¶]  I have sat on that information for three hours, trying to figure out what to do.  I came down to [the following] alternatives:  (a) call [Woodell] and tell him that I found the phone and just forget the whole thing, (b) call Woodell and give him some ultimatum (drop out of [Kiraly's opponent's] campaign?), and (c) call the police, reporting the vandalism and the found phone (it is virtually certain that the phone fell out of [Woodell's] pocket as he put down the sign because there is no other explanation about how it got behind the hedge where no one

2

would have any reason to go)." He ended the email by asking Kiraly what she would like him to do.

Kiraly responded by telling Bernstein that he should go to the police, as she had "a feeling [Woodell's] involved [with] other shenanigans, too, [regarding her] campaign." She added that maybe they should also contact the press because the newspaper "would probably report this every step of the way so that it's transparent, instead of being hidden because [his wife] is the vice mayor. . . ."

Bernstein contacted the police the morning of October 18, 2011. The police recovered the phone later that day.

On October 24, 2011, The Almanac, a local newspaper, wrote that the Menlo Park police had closed the case regarding Bernstein's finding the phone displaying messages referring to Woodell next to the uprooted sign. It reported that Bernstein found the phone next to the uprooted sign. Bernstein, according to the article, expressed concern that he might be accused of stealing the phone and, consequently, gave it to the police. The article explained, "Investigators determined there was no crime, since the sign had merely been moved, not stolen . . . ." The article noted that the sign in Woodell's yard was for the candidate running against Kiraly and that Woodell claimed he supported both candidates.

On October 31, 2011, Woodell filed "a Google Remedy ticket to get a full call log from T-Mobile for the time" his phone was missing. He was informed that "this sometimes requires a court order on corporate accounts."

On November 1, 2011, Woodell wrote a letter entitled, "Suspicious Incident," and gave it to the Menlo Park police department. He maintained that his phone had been locked and that incoming text messages could not have been displayed without unlocking the screen. He indicated that he was concerned another individual had found his phone and given it to Bernstein "to use for nefarious purposes."

On November 22, 2011, after garnering information from the phone, Woodell sent a letter with attached documents to the Menlo Park Police Department. The documents referenced outgoing calls, SMS messages, and voicemail that he said were received or

stored on his cell phone. He reported, "Based on records of multiple failed calls and delayed SMS messages, the phone was powered off for over 24 hours, then powered up on [Monday, October 17,] at 22:51." He insisted that the phone could not have said, "Woodell family," between Sunday, October 16, at 17:56, and Tuesday, October 18, at 16:20.

At a meeting between Woodell and Officer Tim Brackett in November 2011, Brackett informed Woodell that he, too, had seen a scroll at the top of the phone, which said "Woodell Family."

On December 15, 2011, Woodell sent an email to Kiraly. He stated that Bernstein's "story about when and how he identified the phone [was] not compatible with [his] phone records." He proposed that someone from her campaign team could review his phone record, but she did not respond.

Two days later, on December 17, Woodell spoke to Mickie Winkler, a former mayor of Menlo Park. They discussed the police chief's revelation that Kiraly had been on the street where both Bernstein and Woodell lived on the day the phone was identified. On December 19, he sent an email to Winkler, which conveyed the following information: "I thank[ed] her for 'tossing this around!' One option is that . . . Kiraly found the phone when she was in our neighborhood on October 16. My December 19, 2011[email] discusses that possibility, which is consistent with the evidence we possessed regarding: (1) . . . Kiraly['s] being in our neighborhood the weekend that . . . Bernstein was allegedly out of town; (2) me likely losing the cell phone in my neighborhood on October 15; (3) someone obviously charging my cell phone October 16 while . . . Bernstein was out of town; and (4) the fact that . . . Bernstein discussed messages on the cell phone that came through during the weekend while he was allegedly out of town."

On December 30, 2011, Woodell met with District Attorney Stephen Wagstaffe to discuss possible wrongdoing related to the phone. Wagstaffe agreed to investigate.

Sometime in December 2011, Woodell attended a toy drive event and met and conversed with John Wurdinger. He told Wurdinger that he was contemplating filing a

4

lawsuit against Bernstein. He told Wurdinger that he did not know whether he should sue Bernstein because "it seemed like a big waste of money to do it." Woodell also told Wurdinger that he had the phone records to prove he did not vandalize the sign on Bernstein's property.

On October 11, 2012, Woodell filed a complaint for defamation and conspiracy against defendants.[2] He alleged that on October 17, 2011, Bernstein claimed that Woodell "unlawfully trespassed on his personal property at his home, and unlawfully took down" in his yard the sign in support of Kiraly's campaign for a position on the Fire Board. He asserted that Bernstein reported that Woodell had left the phone next to the uprooted sign in his yard and, thereafter, Kiraly made comments to others that Woodell had stolen her campaign signs. Woodell alleged that these statements were false and made with reckless disregard for the truth.

Woodell was deposed on August 13, 2013. Kiraly's attorney asked him about a photograph he had taken on the phone the night he lost it and whether he had produced a copy of the photograph. Woodell responded: "No, I don't know. The phone's dead and I'm not sure if the photo exists. . . ." Woodell testified that the phone had been acting badly and he "put a whole new operating system on the phone since." He explained: "I've completely wiped the phone, as I do—did many times working for Google, putting new operating systems on. So whatever photo is—if I have it, I'll be happy to produce it, but it's certainly not on the phone anywhere." He said that he wiped out the contents of the phone "[s]ometime in early 2012." He said he did that because the phone was broken. When asked what he meant by the phone being broken, he responded: "The operating system—the phone didn't function and I had to reinstall the operating system." His counsel clarified that Woodell had installed a new operating system. Woodell added: "I pressed the button saying make this phone like it comes from T-Mobile." "It's completely erased, reset, and now the phone doesn't work."

---

[2] Kiraly apparently filed a cross-complaint, which is not at issue in this appeal.

On September 18, 2013, Bernstein served on Woodell a formal discovery request to inspect the phone. Bernstein, who was in propria persona, repeatedly contacted Seth Rosenberg, Woodell's legal counsel, to arrange a time for a phone inspection. He then hired Attorney Patrick C. Kerwin, and Kerwin wrote a letter to Rosenberg on March 5, 2014. Kerwin advised Rosenberg that he would be making an ex parte application for an order shortening time on a motion to compel the inspection.

In February 2014, Bernstein issued subpoenas to Google and T-Mobile. He requested, among other things, all copies of all reports, logs, and/or data pertaining to the operating status and geographical location of the phone during the period of October 15, 2011, through October 20, 2011.

Bernstein and his expert, Martin P. Haeberli, appeared for the inspection on March 11, 2014. Haeberli examined the phone and SIM card. He observed that the charging connector was damaged preventing the phone from receiving any power. He could not proceed further with the phone inspection without additional equipment. During the inspection, a paralegal at Rosenberg's law firm stated that the connector had been damaged for several weeks. Haeberli declared that, had he known this in advance, he could have brought different tools with him that might have permitted him to do a partial inspection. He stated that he had "previously examined a screen shot of the phone that was produced in response to Mr. Bernstein's discovery request . . . . That photo could only have been made with the phone powered on, though the date on the photo is unknown."

Bernstein requested a second inspection. It was after the discovery cut-off and Rosenberg conditioned the phone inspection on his being able to depose Haeberli. Bernstein refused and the second inspection did not occur.

On April 7, 2014, the parties appeared for trial. The matter was referred to a settlement conference. The case did not settle and the court continued the trial date until January 2015. The Almanac quoted Bernstein as stating, "After much effort, we were ready to go to trial. It will be hard to reassemble the witnesses, the exhibits, and the various motions in nine months."

6

On April 17, 2014, Bernstein and Kiraly filed a joint motion for terminating sanctions. In support of their motion, they attached the declaration of Haeberli. He stated that he is an expert of the operation of cell phones and their related equipment, operating systems, and software. He observed: "There are several unanswered questions in this case that could have been answered conclusively had the evidence been preserved from the very beginning. We might have been able to determine the precise whereabouts of the phone after it was lost on Saturday, October 15, 2011, until it was returned to the police on Tuesday, October 18. . . . We would also have known precisely what messages—voice, text, and calendar—had been sent to the phone and at precisely what times they had been received by the phone."

Haeberli pointed out that photos on the phone on the day it was lost "could have yielded important information had they been preserved as JPEG files, the same format in which they were stored on the phone." Instead, the photographs were provided to defendants as PDF files; these PDF files did not contain any of the embedded information (metadata) that might have been available in the underlying JPEG files.

Haeberli concluded that what Bernstein saw on the phone's screen "could easily have been known on October 18, 2011, from the functionality of the phone itself, the version of the Android operating system installed on the phone, the apps installed on the phone, and the hardware and software settings selected. Had the phone been preserved unchanged, that information could be known today."

In opposition to defendants' motion for terminating sanctions, Woodell submitted a declaration from his own expert, asserting that he did not believe that the information on the phone or cell tower information could have tracked the phone's location during the critical period. Woodell also provided his own declaration, explaining his reason for removing the system as follows: " 'In 2012, I noticed that my phone had received and was installing a newer version of the Android operating system. This was not something that I had initiated. After this automatic upgrade my phone became unreliable and unusable. The upgrade process had failed to properly migrate the old setting to a new format, leaving the settings file corrupted. I explained the situation to a Google mobile

support person, and was instructed to wipe out the corrupted setting by re-image the phone [*sic*], which I did.' "

On May 19, 2014, the trial court held a hearing on defendants' motion for terminating sanctions. The court considered the documents submitted and oral argument and two days later it filed its order granting defendants' motion for terminating sanctions based on the "purposeful destruction of potentially exculpatory evidence."

The trial court provided a succinct summary of the background facts: "[Woodell's] suit alleging defamation is rooted in his contention that his cell phone was somehow purloined and used in order to frame him for 'vandalizing' a campaign lawn sign of someone running for elected office in Menlo Park. His contention is that the phone was planted next to the discarded sign in order to cast blame on him. Defendant Bernstein discovered the phone next to the discarded lawn sign in the bushes of his front yard, and turned the phone into police. Thereafter, local media latched onto the story with numerous reports suggesting a scandal was brewing. After months of inquisition and his own investigation, [Woodell] filed this instant matter. All parties seem to agree that the phone and its contents are critical pieces of evidence, with the parties each claiming its probative value will aid in their respective positions. Defendants bring this motion following revelations that [Woodell] wiped clean the operating system of the phone and installed a new or updated version. This action has destroyed any relevant information which the phone retained on and about the date of the 'sign-gate' matter in October 2011. It is critical to defendants because Mr. Bernstein initially reported to the police when he discovered the phone that he saw the words 'Woodell family' displayed on the screen. The officer to whom he made his initial report has also stated that he too saw this same information. [Woodell] has contended that his phone did not have a function at the time which would have allowed for such a display if his phone was in fact 'locked,' as he has repeatedly stated. As such, he asserts that what defendant claims to have seen is impossible. Another critical issue related to the phone is its location during the weekend in which it somehow found its way onto Defendant Bernstein's lawn. Towards that end, defendants sought to subpoena records from [Woodell's] cellular

8

provider T-Mobile, only to learn that cell-tower information is retained by the company for only a six-month period. Since the litigation was not filed until almost a year after the incident which triggered [Woodell's] claims, defendants have never had the opportunity to review cell-tower information. As such, the phone itself and its contents, including possible GPS tracking applications, apps that may have allowed for a message alert repetition function, perishable data such as messages and call logs, and all metadata, are seemingly the only sources of this potentially relevant information."

The trial court observed that defendants provided "ample evidence" to show that Woodell delayed and obstructed their ability to inspect the phone. Once the inspection occurred, the phone battery was dead and the charging mechanism had been irreparably damaged preventing the phone from being plugged into a charger. Consequently, no meaningful inspection occurred. The court added: "What is most disconcerting, however, is the action taken by [Woodell] prior to filing the lawsuit, which included allegedly capturing for his own purpose information from the phone favorable to his position, and then completely wiping clean the operating system such that all potentially relevant information retained on the phone was destroyed."

The trial court noted that Woodell's explanation in his deposition for removing the information on his phone differed slightly, but significantly, from his explanation in his declaration opposing defendants' motion for terminating sanctions. In his deposition Woodell stated that he "wiped clean" the phone because he had done that "many times working for Google" but in his declaration he stated that Google instructed him to wipe out the "corrupted system." In assessing the contradictory evidence, the court found that Woodell "was contemplating legal action in 2011, well before he destroyed the contents of the phone in 2012."

The trial court ruled that Woodell "purposefully destroyed relevant and potentially exculpatory evidence with litigation in mind, which surely was also in anticipation of a discovery request." The court rejected Woodell's argument that he was an unsophisticated phone user and should not be subject to such an extreme sanction and observed that Woodell was "anything but unsophisticated when it comes to using and

9

understanding the Android operating system. He was a Google employee whose responsibilities included utilizing and relying on their proprietary product for his work responsibilities. He stated at his deposition that he had upgraded the Android system 'numerous times' in the course of his job."

The trial court acknowledged that imposing terminating sanctions was severe but concluded that it was "difficult to conceive of a remedial measure which would put the defendants in a position they would have been in had [Woodell] not destroyed the evidence." It determined that it was "patently unjust" to force defendants to continue to defend an action when they had been denied potentially exculpatory evidence. The court thus dismissed Woodell's complaint with prejudice.

On June 5, 2014, Woodell moved for a new trial, or in the alternative, to set aside or vacate the judgment. At a hearing on a matter not related to this appeal, the trial court advised Woodell's counsel that there had been no trial and that the proper procedure for challenging the order dismissing his complaint was to file a motion for reconsideration, which Woodell filed on June 25, 2014. The court never ruled on Woodell's new motion trial.

The trial court held a hearing on Woodell's reconsideration motion, and the court attempted to revive the new trial motion, which had been denied by operation of law. On November 25, 2014, the court filed its order, which it stated was nunc pro tunc to August 5, 2014, and denied Woodell's motion for a new trial.[3]

Woodell filed a timely notice of appeal from the order granting terminating sanctions on August 26, 2014.[4] All the parties filed appellate briefs and Bernstein, who

---

[3] We need not consider whether the trial court had the authority to make this ruling, as the appeal is only from the order imposing terminating sanctions.

[4] Defendants initially argued that the appeal was untimely. We requested supplemental briefing and defendants withdrew this argument. Kiraly served Woodell with written notice of the entry of judgment on June 2, 2014. The trial court's authority to rule on Woodell's motion for a new trial expired 60 days later on August 1, 2014 (Code Civ. Proc, § 660), and Woodell had 30 days, until August 31, 2014, to file a notice of appeal (Cal. Rules of Court, rule 8.108).

is in propria persona on appeal, joined and supplemented the arguments made in Kiraly's appellate brief.

## DISCUSSION

### I. *The Pertinent Law and Standard of Review*

The trial court dismissed Woodell's complaint with prejudice after granting defendants' motion for terminating sanctions based on spoliation of evidence, i.e., the destruction of the phone's operating system and all data on the phone. Code of Civil Procedure section 2023.030, subdivision (d) permits the trial court to impose a terminating sanction for the misuse of the discovery process or spoliation of evidence, and we review such an order under the abuse of discretion standard. (*Doppes v. Bentley Motors, Inc.* (2009) 174 Cal.App.4th 967, 992; *Williams v. Russ* (2008) 167 Cal.App.4th 1215, 1224 (*Williams*).) The propriety of terminating sanctions is determined by the totality of the circumstances, including the willfulness of the improper acts and the detriment to the propounding party. (*Lang v. Hochman* (2000) 77 Cal.App.4th 1225, 1244-1246.) We resolve all evidentiary conflicts most favorably to the trial court's ruling and reverse only if the trial court's order was arbitrary, capricious, or whimsical. (*Williams,* at p. 1224.) "It is appellant's burden to affirmatively demonstrate error and where the evidence is in conflict, we will affirm the trial court's findings." (*Ibid.*)

"Spoliation of evidence means the destruction or significant alteration of evidence or the failure to preserve evidence for another's use in pending or future litigation. [Citations.] Such conduct is condemned because it 'can destroy fairness and justice, for it increases the risk of an erroneous decision on the merits of the underlying cause of action. Destroying evidence can also increase the costs of litigation as parties attempt to reconstruct the destroyed evidence or to develop other evidence, which may be less accessible, less persuasive, or both.' [Citation.] While there is no tort cause of action for the intentional destruction of evidence after litigation has commenced, it is a misuse of the discovery process that is subject to a broad range of punishment, including monetary, issue, evidentiary, and terminating sanctions. (Code Civ. Proc., § 2023.010, subd. (d),

11

2023.030, subds. (a)-(d); *Cedars-Sinai* [*Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 12].)" (*Williams, supra,* 167 Cal.App.4th at p. 1223.)

Discovery sanctions are intended to remedy discovery abuse, not to punish the offending party. Accordingly, sanctions should be tailored to serve that remedial purpose, should not put the moving parties in a better position than they would otherwise have been had they obtained the requested discovery, and should be proportionate to the offending party's misconduct. (*McGinty v. Superior Court* (1994) 26 Cal.App.4th 204, 210-212.)

"[A] party moving for discovery sanctions based on the spoliation of evidence must make an initial prima facie showing that the responding party in fact destroyed evidence that had a substantial probability of damaging the moving party's ability to establish an essential element of his claim or defense." (*Williams, supra,* 167 Cal.App.4th at p. 1227.) Once the moving party makes a prima facie showing, the burden shifts to the responding party to prove the failure to preserve the evidence did not damage the moving party. (*National Council Against Health Fraud, Inc. v. King Bio Pharmaceuticals, Inc.* (2003) 107 Cal.App.4th 1336, 1346.)

## II. *Imposing Terminating Sanctions Was Not an Abuse of Discretion*
### A. *The Court's Order Was Not Contrary to Law*

Woodell contends that imposing terminating sanctions in the present case was contrary to case and statutory law. "A decision 'that transgresses the confines of the applicable principles of law is outside the scope of discretion' and is an abuse of discretion." (*New Albertsons, Inc. v. Superior Court* (2008) 168 Cal.App.4th 1403, 1422 (*New Albertsons*).)

Relying on *New Albertsons, supra,* 168 Cal.App.4th 1403, Woodell contends that the law does not support imposing terminating sanctions when there is a single incident of abuse, rather than a pattern, the abuse occurred prior to any pending litigation, and the

12

offending party did not violate a court order or stipulation.[5] (*Id.* at p. 1408; see also *Doppes v. Bentley Motors, Inc., supra,* 174 Cal.App.4th at p. 992, fn. 5.) He insists that he complied with discovery requests as he produced the phone for inspection and agreed to a second inspection.

It is undisputed that the phone Woodell produced no longer contained the critical data, and the production of the phone was of no value to defendants. Woodell's argument that the law prevented the trial court from imposing terminating sanctions when there was no pattern of discovery abuse or no violation of a prior discovery order is incorrect. Woodell ignores the observation in *New Albertsons, supra,* 168 Cal.App.4th 1403 that case law holds that "sufficiently egregious, misconduct committed in connection with the failure to produce evidence in discovery may justify the imposition of nonmonetary sanctions even absent a prior order compelling discovery, or its equivalent." (*Id.* at p. 1426.) Furthermore, a prior order may not be necessary where the misconduct committed in connection with the failure to produce evidence in discovery is sufficiently egregious or "where it is reasonably clear that obtaining such an order would be futile." (*Id.* at pp. 1424-1426; see *Vallbona v. Springer* (1996) 43 Cal.App.4th 1525, 1545-1546 [futile to bring motion to compel because defendant claimed documents had been stolen]; *Do It Urself Moving & Storage, Inc. v. Brown, Leifer, Slatkin & Berns* (1992) 7 Cal.App.4th 27, 36 [evidence sanctions appropriate despite absence of order compelling discovery, where sanctioned party concededly could not provide audit it had promised].) When, as here, the evidence on the phone had been destroyed, it would have

_____

[5] Woodell also argues that the court "erred" because the abuse could have been adequately addressed by lesser sanctions and the alleged misuse occurred before litigation was pending. He cites various cases and distinguishes the facts of those cases from the present case. (E.g., *R.S. Creative, Inc. v. Creative Cotton, Ltd.* (1999) 75 Cal.App.4th 486, 496-497; *Williams, supra,* 167 Cal.App.4th 1215, 1222; *Electronic Funds Solutions, LLC v. Murphy* (2005) 134 Cal.App.4th 1161, 1183-1184.) However, the question whether the facts in this case support the trial court's ruling is not a legal question. As explained below in parts B through D, the court did not abuse its discretion when it determined that Woodell deliberately destroyed critical evidence when contemplating litigation and that lesser sanctions did not provide an adequate remedy.

13

been futile to require defendants to file a discovery motion as a prerequisite to sanctions for spoliation. (See *Williams, supra,* 167 Cal.App.4th at pp. 1223, 1227.)

Furthermore, the trial court determined there was a pattern of misusing the discovery process. It found defendants provided "ample evidence in support of their complaint as to [Woodell's] delay and obstruction in allowing an inspection of the phone." The court noted that the inspection finally occurred six months after Bernstein's request and, at that point, the phone battery was dead and the charging mechanism had been irreparably damaged.

Woodell argues that the trial court misunderstood the purpose of sanctions and "wrongly believed sanctions should put the injured party in the same position as if the discovery misuses had not occurred." Contrary to Woodell's assertion, the trial court clearly understood the purpose for sanctions. Citing *McGinty v. Superior Court, supra,* 26 Cal.App.4th 204, the court expressly noted that "sanctions should be tailored to serve [their] remedial purpose, should not put the moving part[ies] in a better position than [they] would otherwise have been had [they] obtained the requested discovery, and should be proportionate to the offending party's misconduct." (See *id.* at pp. 210-212.) The court did not order terminating sanctions to place defendants in a better position; rather, it declared there was no remedial measure that would put defendants in the same position they would have been had Woodell not destroyed the phone evidence. The court concluded that it would be unfair to force defendants to spend money to make another attempt to obtain information from Google about the phone's operating system, since Google had earlier refused to comply with a subpoena, and it would be unfair to make defendants defend an action when Woodell had intentionally destroyed critical evidence.

"When a plaintiff's deliberate and egregious misconduct in the course of the litigation renders any sanction short of dismissal inadequate to protect the fairness of the trial, California courts necessarily have the power to preserve their integrity by dismissing the action." (*Stephen Slesigner, Inc. v. Walt Disney Co.* (2007) 155 Cal.App.4th 736, 762.) Here, Woodell has not demonstrated that the trial court misunderstood or misapplied the law regarding imposing terminating sanctions.

14

**B.** *Woodell's Deliberate Destruction of Evidence*

The trial court found that defendants met their prima facie burden of showing that Woodell deliberately destroyed the phone evidence in 2011 in anticipation of legal action. The record amply supported this finding.

Woodell stated that he learned from the police in November 2011 that he could obtain cell tower data only with a subpoena. Wurdinger reported that in December 2011, Woodell told him that he was contemplating filing a lawsuit against Bernstein. In Woodell's memorandum of points and authorities in support of his special motion to strike Kiraly's cross-complaint, Woodell argued that he spoke to Winkler on December 19, 2011, and his comments to her were "about the improper conduct of an elected official *and* efforts as part of a pre-litigation investigation." (Bold in original.)

The record also supported the trial court's finding that Woodell deliberately destroyed the data on the phone. The trial court predicated its findings on Woodell's own inconsistent statements, made under penalty of perjury. At his deposition, Woodell stated that in 2012, he "completely wiped the phone," as he "did many times working for Google, putting new operating systems on." He elaborated: "I pressed the button saying make this phone like it comes from T-Mobile." "It's completely erased, reset, and now the phone doesn't work."

Subsequently, in opposition to defendants' motion for terminating sanctions, Woodell claimed for the first time that the phone automatically installed the newer operating system, corrupting the settings file and making his phone unusable. The Google mobile support person, according to his declaration, instructed him "to wipe out the corrupted settings," which he did.

The foregoing evidence supported the trial court's finding that Woodell deliberately removed the information from his phone in anticipation of litigation and a discovery request.

Woodell argues that the trial court committed prejudicial error when it made factual and credibility findings without holding, as he requested, an evidentiary hearing. He claims that fact-finding based on declarations in lieu of live testimony is "inconsistent

15

with the trial court's vital function of assessing the credibility of witnesses." (*People v. Johnson* (2006) 38 Cal.4th 717, 729, fn. 8.) He maintains that he should also have had the opportunity to cross-examine Bernstein.

Woodell does not cite any case holding a court must conduct an evidentiary hearing prior to imposing terminating sanctions. To the contrary, as a general rule, evidentiary hearings on motions are not required. (*Beckett v. Kaynar Mgf. Co.* (1958) 49 Cal.2d 695, 698, fn. 3 ["[m]otions are usually made and determined on affidavits alone"]; *Doe v. United States Swimming, Inc.* (2011) 200 Cal.App.4th 1424, 1436 ["[o]rdinarily, discovery motions are resolved by declaration"]; *American Federation of State, County and Municipal Employees v. Metropolitan Water District* (2005) 126 Cal.App.4th 247, 263 [" '[i]n a law and motion, writ of mandate hearing, the trial court has broad discretion to decide a case on the basis of declarations and other documents rather than live, oral testimony' "]; *McLellan v. McLellan* (1972) 23 Cal.App.3d 343, 359 ["[w]hile a court has the discretion to receive oral testimony, it may refuse to do so and may properly rule solely on the basis of affidavits"].) California Rules of Court, rule 3.1306(a) provides, "Evidence received at a law and motion hearing must be by declaration or request for judicial notice without testimony or cross-examination, unless the court orders otherwise for good cause shown."

Code of Civil Procedure, section 2023.030, subdivision (d), provides that the court "after notice to the affected party, person, or attorney, and after opportunity for hearing," may impose terminating sanctions for a misuse of the discovery process. "The 'opportunity to be heard,' in the context of a hearing on the issue of sanctions, does not mean the opportunity to present oral testimony." (*Seykora v. Superior Court* (1991) 232 Cal.App.3d 1075, 1082.) This statute does not require an evidentiary hearing, and the record establishes that Woodell had notice and an opportunity to be heard.

California law allows a trial court to rule on a wide variety of pretrial motions, including dispositive motions, based on declarations only and without an evidentiary hearing. (See, e.g., *Erreca's v. Superior Court* (1993) 19 Cal.App.4th 1475, 1496 [no evidentiary hearing is required when ruling on motion to determine good faith settlement

16

under Code Civ. Proc., § 877.6].)  Courts have awarded terminating sanctions without holding an evidentiary hearing.  (See, e.g., *Los Defensores, Inc. v. Gomez* (2014) 223 Cal.App.4th 377, 392 [court awarded terminating sanctions based on deposition testimony and other documentary evidence].)

The trial court did not abuse its discretion in finding—without holding an evidentiary hearing—that defendants met their burden of showing that Woodell deliberately removed the data from the phone in anticipation of litigation.[6]

## C. *Woodell's Destruction of Evidence Damaged Defendants' Litigation Position*

As noted, to prevail on a motion seeking discovery sanctions for spoliation, the moving party must show the destruction of the evidence and the resulting loss of this evidence had a substantial probability of damaging the moving party's litigation position. (*Williams, supra,* 167 Cal.App.4th at p. 1227.)  Once this has been established, the burden shifts to the opposing party to show the lack of prejudice from the loss of the evidence.  (*Ibid.*)  The trial court found that the phone was a critical piece of evidence, and that Woodell had not met his burden of showing a lack of prejudice from the destroyed evidence.

In all cases of alleged defamation, the truth of the offensive statements or communication is a complete defense against civil liability, regardless of bad faith or malicious purpose.  (*Smith v. Maldonado* (1999) 72 Cal.App.4th 637, 646.)  The defendant must show the truth of the statements, but "the defendant need not justify the literal truth of every word of the allegedly defamatory matter.  It is sufficient if the defendant proves true the *substance* of the charge, irrespective of slight inaccuracy in the

---

[6] An independent basis for affirming is that Woodell's request was made orally; he admitted at oral argument in this court that he never made a written request for an evidentiary hearing in the trial court.  California Rules of Court, rule 3.1306 (b) provides: "A party seeking permission to introduce oral evidence [at a law and motion hearing] must file, no later than three court days before the hearing, a written statement stating the nature and extent of the evidence proposed to be introduced and a reasonable time estimate for the hearing. . . ."

details, 'so long as the imputation is substantially true so as to justify the "gist or sting" of the remark.' " (*Id.* at pp. 646-647.)

Haeberli, defendants' expert, declared that the information on the phone could have revealed what Bernstein actually saw on the phone's screen and where the phone was located on a particular date. He observed: "There are several unanswered questions in this case that could have been answered conclusively had the evidence been preserved from the very beginning. We might have been able to determine the precise whereabouts of the phone after it was lost on Saturday, October 15, 2011, until it was returned to the police on Tuesday, October 18. . . . We would also have known precisely what messages—voice, text, and calendar—had been sent to the phone and at precisely what times they had been received by the phone." He also pointed out that photos on the phone on the day it was lost "could have yielded important information had they been preserved as JPEG files, the same format in which they were stored on the phone." Instead, the photographs were provided to defendants as PDF files, and they did not contain any of the embedded information (metadata) that might have been available in the underlying JPEG files.

What Bernstein saw on the screen and the location of the phone when Woodell took his last photograph were relevant to an essential element of defendants' affirmative defense that their statements underlying Woodell's claims were true. Woodell claimed that Bernstein was not telling the truth about seeing Woodell's name scrolled on the phone. He also asserted that Kiraly or some other person found the phone and planted it in Bernstein's yard. If the phone information confirmed that Bernstein could have seen or did see the word, "Woodell," on it or the phone's location prior to Bernstein's finding it, this evidence could have established that Bernstein's statements had been true and he did not conspire with Kiraly to defame Woodell.

Indeed, Woodell's own actions and statements indicated that he clearly understood and agreed that the information on the phone was critical. As soon as Woodell learned that Bernstein had recovered the phone on his property, he insisted that the information on the phone established that Bernstein could not have seen the name Woodell on the

phone. Woodell declared that a reporter disclosed to him that Bernstein had noticed the sign missing before he left town, that Bernstein was out of town on Sunday, October 16, 2011, that Kiraly was at Bernstein's home while he was out of town, and that Bernstein discovered the phone on Monday, October 17, 2011. Woodell told the reporter that his phone records "will show" that he still had possession of his phone until late in the evening on October 15, 2011, and "therefore the moved lawn sign and the missing cell phone [were] unrelated." On November 1, 2011, Woodell presented Detective Brackett with a summary call log as evidence that he still had his phone when the sign was removed. A few weeks later, on November 21, 2011, Woodell again met with Brackett "to provide a new statement and additional evidence including call and SMS logs, phone bills and a timeline showing that Defendant Bernstein could not have witnessed the events he described."

The next month, on December 15, 2011, Woodell sent an email to Kiraly stating that Bernstein's "story about when and how he identified the phone [was] not compatible with [his] phone records." In December 2011, Woodell told Wurdinger that he had phone records to prove he did not vandalize Kiraly's campaign sign.

Defendants also established that there was no other available method for them to acquire this information. Defendants attempted to acquire the information from Google and T-Mobile but were unsuccessful.

Woodell contends that the phone evidence was not critical as demonstrated by defendants' waiting for more than two years after Bernstein found the phone and more than one year into the litigation to request an inspection. Additionally, he points out that defendants stated they were ready for trial in April 2014, even though they had not been able to inspect the phone.

The timing of defendants' discovery requests does not establish that the information on the phone was not critical to their defense.[7] Defendants did not learn until

_____

[7] It is immaterial that defendants stated they were prepared for trial. At that point, Woodell had admitted removing the critical evidence from the phone and it was clear

19

they deposed Woodell on August 13, 2013, that Woodell was claiming that he took a photograph the night he lost the phone. A photograph on a phone could have revealed the location and time the photograph was taken. Shortly after learning about the photograph, on September 18, 2013, Bernstein requested an inspection of the phone. The inspection did not actually occur until six months later, after the phone battery was dead and the charging mechanism irreparably damaged, but this delay was caused by Woodell.

Furthermore, Bernstein explained in a declaration that Woodell's attorney initiated settlement discussions with him on December 4, 2012, less than two months after Woodell had filed his lawsuit. Woodell's counsel terminated settlement discussions on March 14, 2013. Bernstein, who was in propria persona, did not file discovery requests during this period because of the settlement discussions. Moreover, special motions to strike were filed, staying discovery.

Woodell also argues that the evidence did not show that the information on the phone prejudiced defendants' ability to raise the defense of truth because their expert, Haeberli, could only speculate that the phone had features that would have permitted a determination of the phone's whereabouts. He stresses that Haeberli admitted that "reasonable people may disagree about the degree of precision" that could be obtained from the location data. Woodell points out that his expert opined that such information would be unavailable. Woodell emphasizes that speculation is not evidence. (See *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 864 [evidence in support of in opposition to summary judgment that is based on speculation is not evidence]; *People v. Gardeley* (1996) 14 Cal.4th 605, 618 [expert opinion must be reliable; " '[l]ike a house built on sand, the expert's opinion is no better than the facts on which it is based' "].) He also asserts that even if defendants could establish where the phone was it would not have relieved them of their obligation to conduct a reasonable inquiry into the truth of their accusations.

---

they were not going to be able to discover what information had been on the phone in 2011.

20

Haeberli explained what data could have been on the phone and declared that this information could have shown the date when the phone was in Bernstein's yard and what Bernstein saw on the phone's screen. As the trial court found, the phone's contents were relevant to show the phone's location or functioning at the relevant time. This evidence was also germane to defendants' obligation to make a reasonable inquiry; as noted above, the truth of the "offensive statements or communication is a complete defense against" a claim of defamation, "regardless of bad faith or malicious purpose." (*Smith v. Maldonado*, *supra*, 72 Cal.App.4th at p. 646.)

Indeed, Woodell acknowledged in an email dated December 20, 2011, to Bernstein that the phone had software on it, which enabled him to track its location. In this email he stated: "I've been giving this a lot of thought. One reasonable scenario is that some kid found the phone on Sunday morning, in the street near your house. They took the phone home, started charging it and turned on the power on. Then they later got worried it may have GPS tracking software (which it actually does), and returned to toss it in your yard. . . ." Woodell's claim that the loss of the information on the phone was not significant is belied by his own statements and actions prior to filing this lawsuit.

The trial court did not abuse its discretion in inferring from Woodell's conduct of destroying the information on the phone that the phone contained the critical information Haeberli opined could have been on the phone in 2011. Speculation cannot support a motion for or against summary judgment or a judgment after trial, but spoliation cases, by their very nature, always will be based on some speculation. In such cases, "there will typically be no way of telling what precisely the evidence would have shown and how much it would have weighed in the spoliation victim's favor." (*Cedars-Sinai Medical Center v. Superior Court, supra,* 18 Cal.4th at p. 14.) Indeed, the speculative nature of the evidence was the principal reason the Supreme Court rejected any tort claim based on the spoliation of evidence and concluded that discovery sanctions, such as issue and terminating sanctions, were sufficient. (*Id.* at pp. 13-16; see also *Temple Community Hospital v. Superior Court* (1999) 20 Cal.4th 464, 469-475.) Although speculative evidence cannot support a tort claim, which is the reason the trial court may impose

21

terminating sanctions, the trial court may properly infer from the deliberate destruction of evidence that such "speculative" evidence did not favor the party destroying the evidence. (See, e.g., *Thor v. Boska* (1974) 38 Cal.App.3d 558, 565-568 [defendant unable to produce original clinical record concerning treatment of plaintiff after charged with malpractice, and unavailability of original records created a strong inference of consciousness of guilt].)

Accordingly, we conclude that the trial court did not abuse its discretion when it concluded that the lost evidence critically harmed defendants' ability to defend themselves against Woodell's defamation and conspiracy claims.

## D. *Lesser Sanctions*

As noted above, discovery sanctions are intended to remedy discovery abuse, not to punish the offending party; they therefore should be tailored to serve that remedial purpose, should not put the moving parties in a better position than they would otherwise have been had they obtained the requested discovery, and should be proportionate to the offending party's misconduct. (*McGinty v. Superior Court, supra,* 26 Cal.App.4th at pp. 210-212.) Woodell maintains that evidence or issue sanctions would have adequately remedied the harm caused by destroying the information on the phone. He also suggests that the trial court could have dismissed the complaint against Bernstein and permitted the case against Kiraly to go forward since she did not request an inspection of the phone.[8]

Woodell argues that "a court is required to use the least restrictive sanction and take an incremental approach." Here, the trial court carefully considered whether an alternative sanction was appropriate. The court concluded that an issue or evidence

---

[8] Defendants' interests were sufficiently aligned that it would have been useless duplication of effort for Kiraly to pursue the same discovery and seek the same remedies made by Bernstein against Woodell. (*Parker v. Wolters Kluwer United States, Inc.* (2007) 149 Cal.App.4th 285, 301 [non-propounding party can be awarded discovery sanction when "propounding party and a coparty are so closely aligned it would be a useless duplication of effort for both parties to pursue the same discovery and invoke the same remedies against an opposing party"].)

22

sanction was inadequate because such a sanction would not put defendants in the place they would have been had Woodell not destroyed the evidence. Destruction of evidence undermines two important goals of the legal system—truth and fairness. The question before us "is not whether the trial court should have imposed a lesser sanction; rather, the question is whether the trial court abused its discretion by imposing the sanction it chose. [Citation.]' " (*Collisson & Kaplan v. Hartunian* (1994) 21 Cal.App.4th 1611, 1620.)

Woodell claimed that he could not have lost the phone on Bernstein's property and another person must have planted it there. He also insisted that Bernstein could not have seen his name scrolled on the phone. Since no party came forward with any evidence that there was an eyewitness to the vandalizing of the sign or that any person had any other credible information about who uprooted the sign on Bernstein's property, the only directly relevant evidence was the information on the phone. As the trial court found, it would be patently unjust to require defendants to continue to defend an action "for which they have been denied potentially exculpatory evidence by the willful destruction by" Woodell.

## DISPOSITION

The judgment is affirmed. Woodell is to pay the costs of appeal.

_____
Kline, P.J.

We concur:


_____
Stewart, J.


_____
Miller, J.


*Woodell v. Bernstein* (A142836)